UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

ABDULLAHI KHALIF NOOR,

                Petitioner,

    v.

MELISSA ANDREWJESKI,

                Respondent.

CASE NO. 2:22-cv-00270-JHC-BAT

**REPORT AND RECOMMENDATION**

      Petitioner is a prisoner currently confined at Coyote Ridge Corrections Center in Connell, Washington. By counsel, he seeks habeas relief under 28 U.S.C. § 2254 from a 2016 King County Superior Court judgment and sentence. Dkts. 1 & 10 at Ex. 1. Respondent has filed an answer to Petitioner's habeas petition and submitted relevant portions of the state court record. Dkts. 9, 10. Petitioner has filed a response to Respondent's answer. Dkt. 13.

      The Court having considered the parties' submissions, and the record, recommends DENYING the federal habeas petition, Dkt. 1, without an evidentiary hearing and DISMISSING the case with prejudice. The Court also recommends that issuance of a certificate of appealability (COA) be DENIED.

//

//

REPORT AND RECOMMENDATION - 1

# FACTUAL AND PROCEDURAL HISTORY

The Washington Court of Appeals ("Court of Appeals"), on direct appeal, summarized

the facts relevant to Petitioner's conviction as follows:

> S.K. was born in Somalia on September 23, 1998. When she was approximately
> 6–years–old, S.K. moved to Nairobi, Kenya to live with her grandmother. Her
> grandmother passed away when S.K. was 11– or 12–years–old. S.K then lived with their
> neighbors. The neighbors introduced S.K. to Abdullahi Khalif Noor and told
> her Noor was going to be her husband. Noor and S.K. never married but S.K. went to live
> with him to take care of his 1–year–old son M.N.[1] Noor left and went to the United States
> to work as a cab driver. When Noor periodically returned to Kenya, he would berate and
> beat S.K.
>
> In 2011 or 2012, Noor decided M.N. and S.K. should move to the United
> States. Noor told S.K. to use "May 12, 1990" as her birthdate and to use his mother's
> name "Hadiyo Ali." Noor created documents to show that Hadiyo Ali with a May 12,
> 1990 date of birth and he were married.
>
> S.K. arrived in Seattle in May 2014. S.K. took care of M.N. and M.N. attended
> school. Noor helped S.K. get a part-time job in a downtown Seattle hotel. Noor
> demanded S.K. have sex with him. When S.K. tried to refuse sex and get away from
> him, Noor held her down and put a knife to her neck. After that, S.K. did not "fight back
> anymore." Noor ordered S.K. not to speak to anyone at the apartment complex and beat
> her if he thought she had disobeyed.
>
> On the evening of May 28, 2015, S.K. accidentally locked herself out of the
> apartment. M.N. was asleep inside. S.K. was frantic and was afraid Noor would kill her if
> he found out. S.K. went to the apartment of a neighbor, Ifrah Noor, to get help.[2] Ifrah's
> son and M.N. attended the same school. Ifrah called Noor. While waiting outside the
> apartment for Noor to arrive with a key, S.K. begged Ifrah and Ifrah's sister, "[D]on't go,
> don't leave me alone, stay with me." When Noor arrived at approximately 10:00 p.m., he
> told Ifrah and her sister they could leave.
>
> As Noor and S.K. entered the apartment, Noor kicked S.K. so hard she landed on
> the floor. Noor beat S.K. with his fists for approximately three hours until she vomited
> blood.
>
> The next morning, S.K. went to her job in downtown Seattle but was unable to
> work because she was "throwing up blood" and in pain. S.K. called Ifrah and asked for

---

[1] By way of clarification, the Court notes that in the record Petitioner's son is at times referred to as "M.N." and at times as "M.K." However, there appears to be no dispute that M.N. and M.K. both refer to the same individual, Petitioner's son. The Court in addressing the habeas petition has generally used the initials M.N. to refer to Petitioner's son as those were the initials used by the Court of Appeals in its opinion.

[2] [FN 1 by Court of Appeals] Ifrah Noor is not related to the defendant. To avoid confusion, we refer to Ifrah Noor by her first name throughout the opinion.

help. Ifrah met S.K. at the train station. They walked to Ifrah's mother's house nearby. Ifrah needed to drive her mother Shukri Osman to Burien. As Ifrah was driving with Osman and S.K. in the car, she noticed Noor was following her in his car. Ifrah decided to drive into a store parking lot "because [she] wanted somewhere where there'd be other people" and parked. Noor pulled up next to them and got out of his car. Noor was "upset" and began shaking the car. Noor tried to reach through an open window to hit S.K. Ifrah's mother Osman was able to convince Noor to leave and let the Somali community address the problem.

S.K. and Ifrah spent the night at Osman's house. Noor left messages on Ifrah's phone threatening to harm her if S.K. did not return.

The next morning, Ifrah called the police to report the assault of S.K. and the threats Noor made to Ifrah. The police went to Osman's house. S.K. told the police her name was Hadiyo Ali. An officer took photographs of her bruises. S.K. went to Swedish Medical Center Emergency Room. S.K. was still in pain and had "multiple contusions" on her body. Child Protective Services (CPS) took M.N. into protective custody.

The police arrested Noor. The city of Seattle charged Noor with misdemeanor assault of "Hadiyo Ali" in the fourth degree. The municipal court issued a no-contact order prohibiting Noor from contacting Hadiyo Ali and Ifrah. Despite the no-contact order, when he was released from jail, Noor lived in the apartment with S.K. and M.N.

The State charged Noor with domestic violence assault of Hadiyo Ali in the fourth degree, two counts of domestic violence misdemeanor violation of a court order "for the protection of Hadiyo F. Ali," and felony harassment and felony stalking of Ifrah.

After the State filed charges, Noor threatened to kill S.K. if she did not convince the police and the prosecutor to drop the charges. Noor told her, "If you don't follow what I tell you, you will not be alive." Noor gave S.K. a new phone and used a different phone to call S.K. so "[t]he police won't know."

Noor threatened to hurt M.N. if S.K. did not obey him. Fearful Noor would hurt M.N., S.K. "stopped going to work" so she could stay home with M.N. On one occasion, a man she did not know "called [S.K.] and said [M.N.]'s father said" to give him M.N. "in 30 minutes." After the man arrived, knocked on the apartment door, and would not leave, S.K. called the police. When Noor threatened to "cut" M.N. and blame it on her, S.K. decided she had "to tell the truth." S.K. met with the prosecutor.

The State filed an amended information changing the name of Hadiyo Ali to "S.K. (DOB 9/23/98) aka H.F.A." The State charged Noor with rape of S.K. in the second degree, rape of S.K. as a child in the third degree, felony harassment of S.K., witness intimidation of S.K., assault of S.K. in the fourth degree, three counts of misdemeanor violation of the court order protecting S.K., and felony harassment and felony stalking of Ifrah.

The five-day jury trial began on June 2, 2016. The defense theory was S.K. was not credible. The State called several witnesses, including police officers, Ifrah, Ifrah's mother Osman, a Swedish Medical Center employee, and S.K.

S.K. testified that Noor forced her to have sex and beat her. S.K. said Noor told her she "cause[d] all the trouble" and threatened to kill her if she did not convince the police and prosecutor to drop the charges. S.K. said Noor told her to change her statement and say he did not hit her. S.K. testified that Noor forced her to sign a letter to the court and to tell his attorney that she "was lying about" Noor and that "what [she] told the police about being hit wasn't true." S.K. said she was afraid of Noor and she believed he would kill her if she did not comply with his demands.

The defense did not call any witnesses. During closing argument, defense counsel argued S.K. lied and was not credible.

What is truth, what is a lie.... Depending on what facts you accept, you heard from Hadiyo Ali, 26 years old, or you heard from [S.K.], 17 years old. She is either married to my client, or she is not.

The jury found Noor guilty of rape of S.K. in the second degree, assault of S.K. in the fourth degree, witness intimidation of S.K., and three counts of misdemeanor violation of the court order issued to protect S.K.[3] The jury found Noor guilty of misdemeanor harassment of S.K. and Ifrah. The jury found Noor not guilty of third degree rape of a child as to S.K. or felony stalking of Ifrah.

Dkt. 10, Ex. 2 at 18-22.

Petitioner sought direct review in the Court of Appeals, *id.*, Exs. 4-7, and the Court of Appeals affirmed the judgment and sentence. *Id.*, Exs. 2, 8, 9, 10. Petitioner sought review by the Washington Supreme Court. *Id.*, Exs. 11, 12. The Washington Supreme Court denied review on November 28, 2018. *Id.*, Ex. 12. The Court of Appeals issued the mandate on December 28, 2018. *Id.*, Ex. 13.

Represented by counsel, Petitioner filed a personal restraint petition (PRP) in the Court of Appeals on December 18, 2019. *Id.*, Exs. 14-16. The court denied the PRP. *Id.*, Ex. 3. Petitioner sought review by the Washington Supreme Court. *Id.*, Ex.17. Petitioner presented the following issues to the Washington Supreme Court:

1. Mr. Noor was accused of raping [H.A.], his adult spouse who was born in 1990 in Somalia. At trial, Ms. [A.] instead claimed to be "S.K.", born in 1998, and thus a child at the time of the marriage. Throughout the trial, in both oral and written instructions to the jury, the trial court adopted the State's narrative that the complaining

---

[3] [FN 2 by Court of Appeals] By special verdict, the jury found Noor and S.K. were "members of the same family or household" when he committed the crimes.

REPORT AND RECOMMENDATION - 4

witness was "S.K." born in 1998. Did the trial court's use of the initials "S.K." and a birth date in 1998 lower the State's burden of proof, constitute a comment on the evidence and constitute an improper court closure and improper sealing of public records, all in violation of the First, Sixth and Fourteenth Amendment to the United States Constitution, and article I, sections 3, 4, 5, 10, 21 and 22, and article IV, section 16, of the Washington Constitution?

2. The King County Prosecuting Attorney's Office ("KCPAO") worked closely with two law enforcement agencies on this case, the Seattle Police Department ("SPD") and Child Protective Services ("CPS"). SPD and CPS had evidence in their possession that Mr. Noor's eight-year-old son, M.K., had told a CPS forensic interviewer that his step-mother's name was "[H.]" and that she was 25 years old. He also told the interviewer that he never witnessed any violence in the home. Did the State violate its duty to disclose exculpatory evidence in violation of the Fourteenth Amendment and article I, section 3?

3. Throughout the entire trial, the trial judge lectured the jurors about the dangers of doing their own independent research, telling stories about jurors in different parts of the country and abroad who had violated admonitions and caused mistrials, and were found in contempt or were sentenced to jail. Did such warnings against the cost of mistrials constitute juror coercion that prevented a hung jury, thereby violating Mr. Noor's right to trial by jury protected by the Sixth and Fourteenth Amendments and article I, sections 21 & 22?

4. Where the jury instructions for the no-contact order violations used the language "on or about" and the State argued that Mr. Noor engaged in a summer-long course of conduct that violated no-contact orders, should Counts II, III and VIII have been considered to the "same criminal conduct" and does conviction and sentencing on all three counts as separate crimes violate double jeopardy under the Fifth and Fourteenth Amendments and article I, section 9?

4. [sic] Was there sufficient evidence to sustain a conviction for Count VIII under the protective standard of the Fourteenth Amendment?

5. [sic] Did Mr. Noor receive effective assistance of counsel at trial, at sentencing, and on appeal, and were his due process rights violated by his lack of understanding of the sentencing structure if he went to trial and lost?

6. [sic] Did cumulative error deny Mr. Noor a fair jury trial?

*Id.*, Ex. 17 at 784-86.

The Deputy Commissioner of the Washington Supreme Court denied review. *Id.*, Ex. 18. Petitioner moved to modify the Commissioner's ruling denying review. *Id.*, Ex. 19. The Washington Supreme Court denied the motion to modify on January 5, 2022. *Id.*, Ex. 20. The Court of Appeals issued the mandate on January 24, 2022. *Id.*, Ex. 21. Petitioner filed his federal habeas petition on March 7, 2022. Dkt. 1.

## GROUNDS FOR RELIEF

Petitioner raises the following grounds for habeas relief:

REPORT AND RECOMMENDATION - 5

1.  The trial court's use of the complaining witness's chosen initials and date of birth, as opposed to her legal name or initials and the legal date of birth violated a series of constitutional rights.

2.  The State's failure to disclose exculpatory and impeachment information – evidence from a forensic interview with M.K., Mr. Noor's son – violated the Fourteenth Amendment's guarantee of due process of law, *Brady v. Maryland*, 373 U.S. 83 (1963) and *Kyles v. Whitley*, 514 U.S. 419 (1995). The failure of defense counsel to obtain this information on its own violated the right to effective assistance of counsel protected by the Sixth and Fourteenth Amendments and *Strickland v. Washington*, 466 U.S. 668 (1984).

3.  The trial court's constant admonitions of the jury were unduly coercive and violated due process and the right to a jury trial under U.S. Const. amends. VI and XIV.

4.  Separate convictions and sentences for Count 6 (harassment) and Count 7 (intimidating a witness) violate the prohibition against Double Jeopardy protected by U.S. Cons. amends. V & XIV.

5.  Separate convictions and sentences for Counts II, III and VIII (violation of court order counts) violate the prohibition against Double Jeopardy protected by U.S Cons. amends. V & XIV.

6.  There was insufficient evidence for Count 8, violation of a court order, in violation of due process of law as protected by the Fourteenth Amendment and *Jackson v. Virginia*, 443 U.S. 307 (1979).

7.  Mr. Noor received ineffective assistance of counsel at trial and on direct appeal in violation of the right to counsel and right to due process of law protected by the Sixth and Fourteenth Amendments, *Strickland v. Washington*, 466 U.S. 668 (1984), and *Evitts v. Lucey*, 469 U.S. 387 (1985).

Trial counsel did not find out on his own that DSHS/CPS and the police had exculpatory information in their possession regarding M.K.'s interview. Trial counsel proposed one instruction that used the pseudonym "S.K." for [sic] instead of "H.A." or the complainant's real name, and did not except to the other instructions using S.K. and did not object when the judge identified the complainant to the jury at the beginning of the trial as "S.K." with a 1998 birth date. Counsel failed to argue that multiple counts either were the "same criminal conduct" or that convictions for all counts violated double jeopardy. Counsel did not object to the trial judge telling the jury stories about the other jurors found in contempt.

Trial counsel also did not submit mitigating evidence to the sentencing judge – evidence of extreme trauma in Mr. Noor's life – that should have been considered when deciding what minimum term he should receive. Trial counsel also did not explain to Mr. Noor in a way that he could understand the jeopardy he faced if he turned down a deal of a few years in prison and went to trial and lost – i.e. that he would receive an indeterminate life sentence with a very long minimum term – and thus Mr. Noor was not able meaningfully to participate in the plea bargaining phase of the case.

On appeal, counsel did not raise challenges to the use of the pseudonym "S.K." and 1998 birth date in the oral and written instructions to the jury, nor did counsel raise the same

criminal conduct or double jeopardy claims regarding Counts 2, 3 and 8, nor did counsel raise issues involving the trial court's coercive statements to the jurors.

8.  Mr. Noor's rights to due process of law and right to a fair jury trial protected by the Sixth and Fourteenth Amendments were violated by cumulative error.

Dkt. 1 at 5-24; Dkt. 5.

# DISCUSSION

A.    Legal Standards

    1.    *Exhaustion and Timeliness*

Respondent concedes each habeas ground for relief has been properly exhausted and that the habeas petition is timely. Accordingly, Petitioner's habeas claims are properly before the Court.

    2.    *Merits Review*

Under the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), the Court may grant a habeas corpus petition with respect to any claim adjudicated on the merits in state court only if (1) the state court's decision was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or (2) the decision was based on an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d). In considering claims under § 2254(d), the Court is limited to the record before the state court that adjudicated the claim on the merits, and the petitioner carries the burden of proof. *Cullen v. Pinholster*, 563 U.S. 170, 181-82 (2011); *see also Gulbrandson v. Ryan*, 738 F.3d 976, 993 (9th Cir. 2013). "When more than one state court has adjudicated a claim, [the Court analyzes] the last reasoned decision." *Barker v. Fleming*, 423 F.3d 1085, 1091-92 (9th Cir. 2005) (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991)).

Under § 2254(d)(1)'s "contrary to" clause, a federal court may grant the habeas petition only if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a

1    question of law, or if the state court decides a case differently than the Supreme Court has on a

2    set of materially indistinguishable facts. *See Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).

3    Under the "unreasonable application" clause, a federal habeas court may grant the writ only if

4    the state court identifies the correct governing legal principle from the Supreme Court's

5    decisions, but unreasonably applies that principle to the facts of the prisoner's case. *See id.* at

6    407-09. The Supreme Court has made clear that a state court's decision may be overturned only

7    if the application is "objectively unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003).

8    The Supreme Court has further explained that "[a] state court's determination that a claim lacks

9    merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the

10   correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011)

11   (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

12        Clearly established federal law, under the AEDPA, means "the governing legal principle

13   or principles set forth by the Supreme Court at the time the state court render[ed] its decision."

14   *Lockyer*, 538 U.S. at 71-72. This includes the Supreme Court's holdings, not its dicta. *Id.* "If no

15   Supreme Court precedent creates clearly established federal law relating to the legal issue the

16   habeas petitioner raised in state court, the state court's decision cannot be contrary to or an

17   unreasonable application of clearly established federal law." *Brewer v. Hall*, 378 F.3d 952, 955

18   (9th Cir. 2004) (citing *Dows v. Wood*, 211 F.3d 480, 485-86 (9th Cir. 2000)).

19        Regarding § 2254(d)(2), a petitioner may only obtain relief by showing that the state

20   court's conclusion was based on "an unreasonable determination of the facts in light of the

21   evidence presented in the state court proceeding." *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005)

22   (quoting 28 U.S.C. § 2254(d)(2)); *see also Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) ("[A]

23   decision adjudicated on the merits in a state court and based on a factual determination will not

1    be overturned on factual grounds unless objectively unreasonable in light of the evidence

2    presented in the state-court proceedings."). The Court presumes the state court's factual findings

3    to be sound unless the petitioner rebuts "the presumption of correctness by clear and convincing

4    evidence." *Miller-El*, 545 U.S. at 240 (quoting 28 U.S.C. § 2254(e)(1)).

5    B.    Analysis

6         1.    *Ground One:*

7         In Ground One, Petitioner contends "[t]he trial court's use of the complaining witness's

8    chosen initials and date of birth, as opposed to her legal name or initials and legal date of birth

9    violated a series of constitutional rights." In specific, Petitioner argues "the trial court's oral and

10   written instructions to the jury using the pseudonym 'S.K.', and a 1998 date of birth, as opposed

11   to the complainant's legal name or the initials H.A. and her legal birth date from 1990, lowered

12   the State's burden of proof, interfered with [Petitioner's] right to a public jury trial, and

13   constituted a court closure, in violation of the First, Sixth, and Fourteenth Amendments." Dkt. 1

14   at 17; Dkt. 5 at 7-12.

15        "[T]he fact that [an] instruction was allegedly incorrect under state law is not a basis for

16   habeas relief." *Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991). In a habeas case, the question before

17   the Court is "whether the ailing [jury] instruction by itself so infected the entire trial that the

18   resulting conviction violates due process." *Id*. at 72 (citing *Cupp v. Naughten*, 414 U.S. 141, 147

19   (1973)). "Where, for example, a jury instruction relieves the prosecution of its burden in proving

20   every element of the offense beyond a reasonable doubt, the jury instruction violates due process."

21   *Roettgen v. Ryan*, 639 F. Supp. 2d 1053, 1066 (C.D. Cal. June 30, 2009) (citing *Middleton v.*

22   *McNeil*, 541 U.S. 433, 437 (2004)); *see United States v. Gaudin*, 515 U.S. 506, 510 (1995) (The

23   Fifth and Sixth Amendments require that "criminal convictions [must] rest upon a jury

REPORT AND RECOMMENDATION - 9

1   determination that the defendant is guilty of every element of the crime with which he is

2   charged, beyond a reasonable doubt."). If the Court is reviewing an ambiguous instruction, the

3   inquiry is "'whether there is a reasonable likelihood that the jury has applied the challenged

4   instruction in a way' that violates the Constitution." *Estelle*, 502 U.S. at 72 (quoting *Boyde v.*

5   *California*, 494 U.S. 370, 380 (1990)). The challenged jury instruction "must be considered in the

6   context of the instructions as a whole and the trial record." *Id.* (quoting *Cupp*, 414 U.S. at 147).

7        Further, this claim appears to allege the trial judge impermissibly commented on the

8   evidence. Dkt. 5 at 10 ("the trial judge commented on the evidence. . . ").  In federal habeas

9   review of a claim alleging judicial bias or misconduct, the issue is whether, viewed in the context

10  of the trial as a whole, the judge's behavior rendered the trial so fundamentally unfair as to

11  violate due process. *Duckett v. Godinez*, 67 F.3d 734, 740–41 (9th Cir. 1995). To succeed on

12  such a claim on habeas review, there must be an "extremely high level of interference" by the

13  trial judge creating a "pervasive climate of partiality and unfairness." *Id.* A petitioner must

14  "overcome a presumption of honesty and integrity in those serving as adjudicators[.]" *Withrow v.*

15  *Larkin*, 421 U.S. 35, 47 (1975). "In the absence of any evidence of some extrajudicial source of

16  bias or partiality, neither adverse rulings nor impatient remarks are generally sufficient to

17  overcome the presumption of judicial integrity, even if those remarks are 'critical or

18  disapproving of, or even hostile to, counsel, the parties, or their cases.'" *Larson v. Palmateer*,

19  515 F.3d 1057, 1067 (9th Cir. 2008) (quoting *Liteky v. United States,* 510 U.S. 540, 555 (1994)).

20       Additionally, "opinions formed by the judge on the basis of facts introduced or events

21  occurring in the course of the current proceedings, or of prior proceedings, do not constitute a

22  basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism

23  that would make fair judgment impossible." *Liteky,* 510 U.S. at 555.  A petitioner "would be

1  entitled to relief only if the record disclosed actual bias on the part of the trial judge or leaves the

2  reviewing court with an abiding impression that the judge's conduct projected to the jury an

3  appearance of advocacy or partiality." *Gupta v. Beard*, No. CV 14-1709-, 2015 WL 1470859, at

4  *36 (C.D. Cal. Mar. 30, 2015) (citing *United States v. Mostella*, 802 F.2d 358, 361 (9th Cir.

5  1986)).

6         The First and Sixth Amendment generally require criminal proceedings be open to the

7  public and press. *Waller v. Georgia*, 467 U.S. 39, 44 (1984). The right to a public trial was

8  created for the benefit of defendants and allows for the public to see that the accused is treated

9  fairly, helps ensure that the judge and prosecutor carry out their duties responsibly, encourages

10  witnesses to come forward, and discourages perjury. *Id.* at 46; *U.S. v. Sherlock*, 962 F.2d 1349,

11  1356 (9th Cir. 1989). "'The denial of a defendant's Sixth Amendment right to a public trial

12  requires some affirmative act by the trial court meant to exclude persons from the courtroom.'

13  *United States v. Al Smadi*, 15 F.3d 153, 155 (10th Cir. 1994). Accordingly, a defendant's right to

14  a public trial is only implicated by a 'closure.'" *United States v. Shyrock*, 342 F.3d 948, 974 (9th

15  Cir. 2003) (citing *United States v. Ivester*, 316 F.3d 955, 958 (9th Cir. 2003)).

16         In *Waller*, the Supreme Court addressed a *total* closure of an entire suppression hearing

17  from the public and determined that whether such a closure is justified under the constitution

18  must be analyzed under the following factors: "the party seeking to close the hearing must

19  advance an overriding interest that is likely to be prejudiced, the closure must be no broader than

20  necessary to protect that interest, the trial court must consider reasonable alternatives to closing

21  the proceeding, and it must make findings adequate to support the closure." *Waller*, 467 U.S. at

22  48; *see also*, *Presley v. Georgia*, 558 U.S. 209, 216 (2010) (closure of courtroom to lone member

23  of the public who tried to attend jury selection violated right to public trial where trial

1    court failed to "consider all reasonable alternatives to the closure"). Some Circuit courts have

2    also found that certain "closures" do not implicate the public trial right. For instance, the Second

3    Circuit has held that an unjustified closure that does not undermine the values furthered by the

4    public trial guarantee does not violate the Sixth Amendment. *Peterson v. Williams*, 85 F.3d 39,

5    42–43 (2nd Cir. 1996) (20 minute closure found too trivial). The Ninth Circuit has applied

6    *Peterson* to hold a trivial closure of routine jury administrative matters does not violate the Sixth

7    Amendment where the closure does not "involve[ ] the values that the right to a public trial

8    serves[.]" *Ivester*, 316 F.3d 955, 960 (citing *Peterson*, 85 F.3d at 43 and *Waller*, 467 U.S. at 46–

9    47) ("very brief" closure to question jurors found too trivial to implicate the Sixth Amendment).

10    Moreover, as the Ninth Circuit has held, "the *Waller* framework applies only

11    to *total* closures—i.e., where '*all* persons other than witnesses, court personnel, the parties and

12    their lawyers [a]re excluded for the duration of the hearing[.]'" *United States v. Rivera*, 682 F.3d

13    1223, 1236 (9th Cir. 2012) (quoting *Woods v. Kuhlmann,* 977 F.2d 74, 76 (2d Cir. 1992));

14    *Sherlock*, 962 F.2d at 1357. Although some Circuit courts have applied a "substantial" interest

15    test, rather than a "compelling" interest test in cases where there is a "partial closure" of the

16    courtroom, it does not appear the Supreme Court has adopted this test or otherwise addressed

17    anything less than a total closure. *See Sherlock*, 962 F.2d at 1357 (finding no violation of

18    defendant's right to a public trial where trial court excluded defendants' family members during

19    one witness's testimony, because partial closure was justified to protect young victim of sex

20    crimes from trauma and embarrassment); *Bucci v. United States*, 662 F.3d 18, 23 & n.3 (1st Cir.

21    2011); *Bunn v. Lopez*, 2016 WL 4010038, at *14 (E.D. Cal. July 26, 2016), *subsequently aff'd*,

22    740 F. App'x 145 (9th Cir. 2018) ("No United States Supreme Court case holds that a defendant's

23    right to a public trial is violated by less than a total closure of the courtroom[.]").

1    The Court of Appeals rejected Petitioner's challenges to the trial court's use of the initials

2   "S.K." and date of birth in 1998 in some statements and instructions to the jury, in denying his

3   PRP:

4           Noor seeks reversal by arguing that the trial court's use of S.K.'s initials in the
        "to-convict" jury instructions was a comment on the evidence and a violation of his right
5       to a public trial. But we recently rejected this argument in *State v. Mansour*, 14 Wn. App.
        2d 323, 470 P.3d 543 (2020), *review denied*, 196 Wn.2d 1040, 479 P.3d 708 (2021).
6           In *Mansour*, we held a trial court's use of initials to identify a victim of child
        molestation in the to-convict instructions "was not a judicial comment on the evidence,"
7       reasoning that, identifying a victim either by full name or initials, "did not impermissibly
        instruct the jury that a matter of fact had been established as a matter of law." *Mansour*,
8       14 Wn. App. 2d at 330. We also held the use of "initials in the to-convict instruction did
        not deprive Mansour of due process or his right to a fair and impartial jury," explaining
9       that the jury "was specifically instructed that Mansour was presumed innocent and that
        the State must prove all elements of child molestation beyond a reasonable doubt."
10      *Mansour*, 14 Wn. App. 2d at 331. Finally, we held no court closure occurred where the
        instructions used the victim's initials but the victim "testified using her full name in open
11      court and was consistently referred to by her full name throughout the proceeding" and
        her "name was fully accessible to spectators and open to any member of the public who
12      appeared in court or read a transcript of the court proceedings." *Mansour*, 14 Wn. App.
        2d at 333.
13          Here, like in *Mansour*, S.K. testified using her full name at trial and was
        consistently referred to by her full name throughout the proceedings. Her name was fully
14      accessible to spectators who appeared in court or read a transcript. The court and parties
        intentionally used S.K.'s initials solely for identification purposes, with the understanding
15      that S.K.'s identity was not an element of any of the charged offenses. Additionally, the
        court instructed the jury that "a defendant is presumed innocent" and the State "has the
        burden of proving each element of each crime beyond a reasonable doubt."
16          Thus, based on *Mansour* and the record before us, we conclude Noor fails to
        show that the challenged instructions involve any constitutional error or actual prejudice.[4]

17   Dkt. 10, Ex. 3 at 42-44.

18      In its ruling denying review, in the context of the PRP, the Washington Supreme Court

19   also rejected Petitioner's claims stating:

20          Mr. Noor mainly argues that the trial court lowered the State's burden of proof,
        improperly commented on the evidence, and improperly "closed" court proceedings by
21      giving jury instructions referring to the victim of most of the crimes by the initials "S.K.,"
        and by referring to the victim by those initials and her alleged date of birth in its opening
22      remarks to the prospective jurors. By background, the State alleged in the information
        that the victim at issue was "S.K.," with a date of birth of 1998. It presented testimony

23   _____

[4] [FN 3 by Court of Appeals] Noor's attempts to distinguish and undermine *Mansour* in his reply brief are
unpersuasive. *Mansour* remains good law.

REPORT AND RECOMMENDATION - 13

1
2
3
4
5
6
7
8
9
10
11
12
13
14

that Mr. Noor had married S.K. in Somalia when she was still a minor and later brought her to the United States. S.K. admitted at trial that when she came to the United States (and in the first stages of the criminal prosecution) she falsely identified herself as [H.A.] with a birth year of 1990, but she claimed she had falsified her identity at Mr. Noor's insistence. Mr. Noor offered no evidence at trial, and he did not dispute that S.K. and [H.A.] were the same person, but he used the fabrication to attack the alleged victim's credibility. Mr. Noor contends that the trial court's instructions and other comments to the jury effectively conveyed its view that the State had proven that the victim was S.K. with a birth year of 1998, as she claimed. (At trial Mr. Noor did not object to the instructions referring to the victim as S.K., and in fact he used those initials in his own proposed instructions. *See, e.g.*, Clerk's Papers (CP) at 61).) But generally, instructions referring to the victim by initials do not improperly comment on the evidence or amount to a closure of the trial to the public where, as here, the alleged victim testifies and is identified by her full name and is otherwise called throughout trial by her full name. *State v. Mansour*, 14 Wn. App. 2d 323, 330-33, 470 P.3d 543 (2020), review denied, 196 Wn.2d 1040 (2021).

Mr. Noor urges this case is distinguishable from *Mansour* because here the victim's true identity was in dispute. But it was in "dispute" only in the sense that the victim admitted she had falsified her name and age when she came to the United States. As indicated, Mr. Noor made this a credibility issue. But in none of its comments or in its instructions did the trial court convey its view that the victim was in fact S.K. with a birth year of 1998. In its opening remarks to the jury, the court merely conveyed what the State had alleged in the information: that the victim was S.K. with a date of birth 1998. *See, e.g.*, 2 Verbatim Report of Proceedings at 237; CP at 43-46. And in its to-convict instructions, the court only informed the jury that to convict it had to find what the State had alleged, for example, that Mr. Noor assaulted the person S.K. CP at 86. The court did not suggest that the State had proven that the alleged victim was in fact named S.K. and not [H.A.] Mr. Noor demonstrates no error on the part of the Court of Appeals on this issue, nor does he otherwise show that this court's review of this issue is warranted.

15    Dkt. 10, Ex. 18 at 835-37.

16    Petitioner argues the state court's decision on these claims is not entitled to deference

17    under the AEDPA because "it does not apply federal law or it uses the wrong standard." Dkt. 5 at

18    10-11. The AEDPA "restricts the circumstances under which a federal habeas court may grant

19    relief to a state prisoner whose claim has already been 'adjudicated on the merits in State court.'"

20    *Johnson v. Williams*, 568 U.S. 289, 292 (2013) (quoting 28 U.S.C. § 2254(d)). No deference to

21    the state court is owed under AEDPA where the state court did not decide the petitioner's

22    constitutional claim on the merits and under such circumstances the federal courts review a

23    habeas petitioner's federal claims de novo. *Patsalis v. Shinn*, 47 F.4th 1092, 1097 (9th Cir.

2022). "[A]n adjudication on the merits is 'a decision finally resolving the parties' claims ... that

1    is based on the substance of the claim advanced, rather than on a procedural, or other,

2    ground.'" *Kirkpatrick v. Chappell*, 950 F.3d 1118, 1131 (9th Cir. 2020) (citing *Lambert v.*

3    *Blodgett*, 393 F.3d 943, 969 (9th Cir. 2004)).

4          On habeas review when a petitioner presents a federal claim "to a state court and the state

5    court has denied relief," courts must presume that "the state court adjudicated the claim on the

6    merits in the absence of any indication or state-law procedural principles to the contrary."

7    *Harrington*, 562 U.S. at 99. "This presumption applies even when the state court resolves the

8    federal claim in a different manner or context than advanced by the petitioner so long as the state

9    court 'heard and *evaluated* the evidence and the parties' substantive arguments.'" *Patsalis*, 47

10   F.4th at 1098 (9th Cir. 2022) (quoting *Johnson*, 568 U.S. at 302 (internal quotation marks and

11   citation omitted); *see also Sturgeon v. Chandler*, 552 F.3d 604, 611–12 (7th Cir. 2009) (holding

12   that constitutional claim was necessarily decided on the merits even though state court only

13   referred to statutory claim). The presumption applies when the state court fails to expressly

14   address the federal claim. *Johnson*, 568 U.S. at 298-302; *Harrington*, 562 U.S. at 98-100.

15         Furthermore, "[a] state court's decision is not 'contrary to ... clearly established Federal

16   law" under 28 U.S.C. 2254(d) merely because the court did not cite to federal law or Supreme

17   Court precedents. *Mitchell v. Esparza*, 540 U.S. 12, 16 (2003). In fact, the Supreme Court has

18   held that even if the state court is unaware of the relevant Supreme Court precedents, a state

19   court's decision is not contrary to clearly established Federal Law, "so long as neither the

20   reasoning nor the result of the state-court decision contradicts [those precedents]." *Id.* at 16

21   (citing *Early v. Packer,* 537 U.S. 3, 7–8 (2002).

22          Here, Petitioner presented his federal claims to the state courts and the state courts

23   denied relief on the merits. *See* Dkt. 10, Ex. 3, Ex. 14 at 215-231, Ex. 17 at 784-94, Ex. 18. In his

1    reply Petitioner argues the "lack of adjudication" of his federal claims on the merits is

2    demonstrated by the fact that the state court cites to only "one case – *State v. Mansour*, 14 Wn.

3    App. 2d 323, 470 P.3d 543 (2020)" which "revolved around court closure issues, comments on

4    the evidence, and the impact on the burden of proof only insofar as the use of initials 'conveyed

5    to the jury that the court considered [the complainant] a victim.'" Dkt. 13 at 7-8. Petitioner

6    argues *Mansour* is distinguishable from this case because the identity of the main witness was

7    not in dispute in that case. *Id.*

8        Petitioner's disagreement with the state court's application of *Mansour* on the grounds

9    that he believes it is factually distinguishable does not rebut the presumption that his claims were

10   adjudicated on the merits. The record shows the state court's decision clearly stated that it was

11   addressing Petitioner's arguments that the trial court's references to "S.K.": lowered the State's

12   burden of proof, improperly commented on the evidence, and improperly "closed" court

13   proceedings, and that the state court decision also addressed Petitioner's attempts to distinguish

14   *Mansour* in its decision. Petitioner also himself acknowledges that *Mansour* revolved around the

15   issues he raised, i.e. court closure issues, comments on the evidence, and the impact on the

16   burden of proof.[5] The Court finds Petitioner's argument that his federal claims were not

17   adjudicated on the merits because the state court cited only to another state court case in

18   evaluating his claims, does not rebut the presumption that his federal claims were adjudicated on

19   the merits. Therefore, the Court concludes AEDPA deference applies.

20       Turning to the substance of Petitioner's claims, Petitioner specifically challenges the trial

21   court's statements to the jury at the outset of *voir dire* that:

22

23   _____

[5] The Court notes that Petitioner makes no argument that the standards articulated under state law were
less demanding than those under federal law, or that the decisions were based on some state-law
procedural principles. *Johnson*, 568 U.S. at 298-302; *Harrington*, 562 U.S. at 98-100.

REPORT AND RECOMMENDATION - 16

1

> I am going to now advise you of the charges. The defendant, Mr. Noor, is charged in
> Count I with Assault in the Fourth Degree, domestic violence, specifically alleging that
> on May 28, 2015, he intentionally assaulted S.K., who's [sic] date of birth was [date
> redacted], 1998.

Dkt. 5 at 7; Dkt. 10, Ex. 23 at 1127. He also challenges the statement that:

> [i]n Count VI, the State has charged Mr. Noor with Felony Harassment, domestic
> violence, alleging that between July 11th and August 6th of 2015, he knowingly, without
> lawful authority, did threaten to cause bodily injury immediately or in the future to S.K.,
> whose date of birth is [redacted] 1998, by threatening to kill her, and his words or
> conduct placed her in reasonable fear that the threat would be carried out.

Dkt. 5 at 7; Dkt. 10, Ex. 23 at 1129. Petitioner also challenges the trial court's use of "S.K" in the

jury instructions and verdict forms themselves. Dkt. 5 at 8; Dkt. 10, Ex. 26 at 1779-1782.

The record here makes clear there was no dispute regarding who the victim of petitioner's

crimes was. The dispute was over the victim's use of identity as "S.K." with a 1998, date of birth

and as "H.A." with a 1990 date of birth. The record reflects during trial, defense counsel

repeatedly challenged the victim's overall credibility and specifically her credibility with respect

to her claimed identity as "S.K." with a date of birth of 1998 as opposed to "H.A.", with a date of

birth of 1990. *See, e.g.,* Dkt. 10, Ex. 26 at 1833 ("What is truth, what is a lie. You can be assured

that there are not many cases in this courthouse quite like this one. Depending on what facts you

accept, you heard from H.A., 26 years old, or you heard from S.K., 17 years old. She's either

married to my client, or she's not."); *Id.* at 1844 ("we don't normally see cases where we don't

even – where there's a dispute as to the identity of the person, the age of the person. What – what

the State is trying to have you accept is that she [the complaining witness] was 11 years old in

Kenya, raising [Petitioner's] son alone for three years, managed to fool the U.S. Embassy, and

this was all at his direction. That she continued to fool everyone all along, at the defendant's

behest. The problem with that is that when you're apparently willing to lie so freely, it becomes

difficult to tell what's up and what's not."); *Id.* Ex. 25 at 1669-1670 (cross-examining

1  complaining witness regarding representing herself to the U.S. Embassy as H.A., born in 1990);

2  *Id.*, Ex. 24 at 1477 (cross-examining social worker regarding complaining witness representing

3  herself as 25 years old and named H.A.); *Id.*, Ex. 24 at 1398-1402 (cross-examining detective

4  regarding complaining witness initially presenting herself as H.A. and 25 and subsequently as

5  S.A. and nearly a decade younger); *Id.*, Ex. 23 at 1266 (calling complaining witness a "liar" and

6  discussing different representations of name and age).

7  　　　　Moreover, reviewing the record as a whole, the Court finds the record supports the state

8  courts' finding that none of the trial court's comments or instructions to the jury conveyed the

9  view that the victim was in fact S.K. with a birth year of 1998. The record reflects the trial court

10  used "S.K." merely as an identifier of the individual against whom the State was alleging

11  Petitioner committed the charged crimes. The state court reasonably concluded based on the

12  record that, in its opening remarks to the jury, the trial court merely conveyed what the State was

13  alleging: that the complaining witness was S.K. with a date of birth 1998.[6] *See, e.g.*, Dkt. 10, Ex.

14  23 at 1129. Similarly, in its to-convict instructions, the court only informed the jury that in order

15  to convict Petitioner, it had to find beyond a reasonable doubt what the State had alleged, that

16  Petitioner had committed the crime charged against the individual the state identifies as "S.K."

17  Dkt. 10, Ex. 26 at 1779-1801

18  　　　　Based upon the record as a whole, the Court finds the record supports the state court's

19  conclusion the trial court did not suggest at any point the State had *proven*, as opposed to

20  alleged, that the victim was in fact named S.K. with a date of birth in 1998 and not [H.A.] with a

21

22

23

---

[6] Petitioner points out that although the Court indicated it was advising the jury of the charges, the second amended information included language that "S.K" was "aka H.F.A." Dkt. 5 at 7; Dkt. 10, Ex. 14 at 298-302. However, reading the record as a whole, the Court does not find that the inclusion of an "aka" in the second amended information renders the state court's findings on this issue unreasonable.

REPORT AND RECOMMENDATION - 18

1    date of birth in 1990. The Court finds there is no dispute that, in the context of this case, the

2    names S.K. and H.A. (both of which were used during the trial to refer to one of the victims in

3    the case) referred to the same individual. There was no other person whom the jury could

4    consider as the victim of the crimes alleged in the case with respect to S.K. Thus, whether the

5    victim's name was in fact S.K. or H.A. was not an element of the crimes that the State was

6    required to prove.

7          Nor was the victim's date of birth (either 1998 or 1990) an element the State had to prove

8    with respect to any of the charges for which Petitioner was convicted. The only charge for which

9    the victim's age, or date of birth, was an element was the child rape charge of which Petitioner

10   was ultimately acquitted. Furthermore, the jury instructions made clear that in order to find

11   Petitioner guilty of the charge of rape of a child, the prosecution had to establish that the

12   complaining witness, "S.K. was at least 14 years old, but was less than 16 years old at the time of

13   the sexual intercourse, and was not married to the defendant, and was not in a State registered

14   domestic partnership with the defendant[.]" Dkt. 10, Ex. 26 at 1793-94. The record also reflects,

15   as the state court noted, the court instructed the jury "a defendant is presumed innocent" and the

16   State "has the burden of proving each element of each crime beyond a reasonable doubt." *Id.* at

17   1778. The record reflects the trial court also instructed the jury that "a charge is only an

18   accusation. The filing of a charge is not evidence that the charge is true. Your decisions as jurors

19   must be made solely upon the evidence presented during these proceedings." *Id.* at 1775.

20         In light of the above, considering the trial court's challenged instructions and statements to

21   the jury in the context of the instructions as a whole and the trial record, the Court finds Petitioner

22   fails to show the challenged instructions relieved the prosecution of its burden of proving every

23   element of the offenses beyond a reasonable doubt, thereby violating due process. Petitioner has

REPORT AND RECOMMENDATION - 19

1    thus failed to show the trial court's challenged statements to the jury so infected the entire trial that

2    his conviction violated due process.  *See, e.g., Husband v. Ryan*, 2015 WL 1799997, at *27 (D.

3    Ariz. Apr. 16, 2015) (finding the petitioner was not entitled to habeas relief when the challenged

4    instruction, in the context of all of the instructions given to the jury, did not have the effect of

5    relieving the state of the burden of proof). Petitioner also fails to show that the trial court's use of

6    the initials "S.K." in the instructions and statements to the jury demonstrated actual bias on the

7    part of the trial judge, projected to the jury an appearance of advocacy or partiality, or that

8    the judge's behavior rendered the trial so fundamentally unfair as to violate due process.

9    Petitioner's arguments to the contrary are largely speculative and fail to demonstrate the state

10   court's rejection of his claims was unreasonable.

11        Finally, Petitioner fails to establish he is entitled to habeas relief based on his assertion

12   the trial court's use of the initials S.K. violated his right to a public trial. Having reviewed the

13   record, the Court finds the state courts properly concluded that S.K. used her full name during

14   her testimony and was referred to by her full name throughout the trial, and further reasonably

15   concluded that her name was therefore fully accessible to the public. The record also supports the

16   state courts' finding, and Petitioner does not argue to the contrary, that the courtroom remained

17   fully open to the public throughout the proceedings and that S.K.'s full name was used openly

18   and repeatedly during the trial and included in the trial transcript. Based on the record, the state

19   court also reasonably concluded that S.K.'s initials were used in the jury instructions and in some

20   of the trial court's statements to the jury for identification purposes only.

21        As noted above, the United States Supreme Court has not held a defendant's right to a

22   public trial is violated by less than a total closure of the courtroom, i.e. - where *all* persons other

23   than witnesses, court personnel, the parties and their lawyers are excluded for the duration of the

hearing, which is not at issue here. Moreover, Petitioner identifies no clearly established United

States Supreme Court precedent, nor is the Court aware of any, indicating a trial court's

reference to a complaining witness by their initials for identification purposes in instructions and

statements to the jury, violates the public trial right, where, as here, the complaining witness

testifies in open court and is identified by her full name, is otherwise called by her full name

throughout trial, and any factual dispute over the complaining witness's name is clear from the

trial record. Accordingly, Petitioner fails to establish he is entitled to habeas relief on this basis.

In sum, Petitioner fails to show that the state courts' determination Petitioner's

constitutional rights were not violated by the trial court's use of the initials S.K. and reference to

a 1998 date of birth in referring to the complaining witness in its statements and instructions to

the jury, was contrary to or an unreasonable application of clearly established federal law, an

unreasonable determination of the facts, or that he is otherwise entitled to habeas relief on this

claim. Accordingly, Ground One should be denied.

2.    *Ground Two*

In Ground Two Petitioner contends "[t]he State's failure to disclose exculpatory and

impeachment information – evidence from a forensic interview with M.K., [Petitioner's] son –

violated the Fourteenth Amendment's guarantee of due process of law, *Brady v. Maryland*, 373

U.S. 83 (1963) and *Kyles v. Whitley*, 514 U.S. 419 (1995).[7]

The Court of Appeals rejected Petitioner's *Brady* challenge in the context of denying his

PRP stating:

---

[7] The Court notes that Petitioner also argues that the failure of defense counsel to obtain this information
on its own violated the right to effective assistance of counsel protected by the Sixth and Fourteenth
Amendments and *Strickland v. Washington*, 466 U.S. 668 (1984). Petitioner's related ineffective
assistance of counsel claim is discussed below in addressing Ground Seven.

1
2

Noor argues that the State suppressed material exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). The State denies a *Brady* violation occurred.

### 1. Background

3
4
5
6

In August 2015, a Child Protective Services (CPS) caseworker interviewed Noor's child M.N. (age six at the time). During this interview, the child reported not witnessing any violence in the home, answered "Hadio" when asked "what's your mom's name," and said Hadio said she was 25-years-old. This caseworker also interviewed Hadio who had disclosed her true identity as 16-year-old S.K. At that point, the CPS caseworker, Prosecutor's Office, Seattle Police Department, and Seattle City Attorney's Office began to coordinate a joint interview of S.K. for purposes of a pending dependency action and Noor's prosecution.

7
8
9
10
11

Later that same month, in a series of e-mail exchanges, trial defense counsel requested the prosecutor's help in coordinating an interview with Noor's child M.N. To the defense's initial request, the prosecutor responded, "I'm not sure where [the child] has been placed for foster care, or that I'd call him as a witness." Counsel then shared that the child was present during some of the alleged offenses and, "[o]nce I locate [the child] I will let you know." The prosecutor responded, saying "I'm not sure what CPS's position will be on" Noor's young child voluntarily participating in an interview. Defense counsel closed discussion on this topic by stating: "In terms of [the child], I am sure we can work something out. My client has asked me to speak to him as he (the child) will have a very different understanding of events and will be able to corroborate my client's side of the story."

12

Neither party called the child to testify at trial. The prosecutor neither had nor requested a "copy of the CPS files relating to this case" and Noor was not aware of the CPS interview of his child until after close of trial.

### 2. Application of Brady

13
14
15
16
17
18
19
20

*Brady* "articulated the government's disclosure obligations in a criminal prosecution: 'the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.' " *State v. Mullen*, 171 Wn.2d 881, 894, 259 P.3d 158 (2011) (quoting *Brady*, US. at 87). The duty to disclose favorable evidence encompasses impeachment evidence as well as exculpatory evidence, *United States v. Bagley*, 473 U.S. 667, 676, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985), and includes evidence contained in the prosecutor's file, as well as evidence in the possession of the police and others working on behalf of the State. *Mullen*, 171 Wn.2d at 895. But, the State " 'is under no obligation to turn over materials not under its control.' " *Mullen*, 171 Wn.2d at 895 (quoting *United States v. Aichele*, 941 F.2d 761, 764 (9th Cir. 1991)). Rather, the State only has "the duty to learn of evidence favorable to the defendant that is known to others acting on behalf of the government in a particular case." *In re Pers. Restraint of Brennan*, 117 Wn. App. 797, 804, 72 P.3d 182 (2003) (citing *Kyles v. Whitley*, 514 U.S. 419, 437, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995)).

21
22
23

To establish a *Brady* violation, a petitioner "must demonstrate the existence of each of three necessary elements: '[(1)] The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [(2)] that evidence must have been suppressed by the State, either willfully or inadvertently; and [(3)] prejudice must have ensued.' " *Mullen*, 171 Wn.2d at 895 (quoting *Strickler v. Greene*, 527 U.S. 263, 281-82, 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999)).

Even if we assume, without deciding, the prosecutor had knowledge of the CPS interview of Noor's child, this claim fails on the suppression prong. "If the nondisclosed

information was available through the defense's own due diligence, there is no suppression under *Brady*." *Mullen*, 171 Wn.2d at 903; *Aichele*, 941 F.2d at 764 (when "a defendant has enough information to be able to ascertain the supposed *Brady* material on his own, there is no suppression by the government."); *Benn*, 134 Wn.2d at 916-17 (" 'a *Brady* violation does not arise if the defendant, using reasonable diligence, could have obtained the information' at issue") (quoting *Williams v. Scott*, 35 F.3d 159, 163 (5th Cir. 1994)).

Here, the record shows that, as of August 2015, defense was on notice Noor's child was in CPS's custody, confident it could "work something out" with CPS, and aware the child would "have a very different understanding of events and [would] be able to corroborate [Noor's] side of the story." Trial began in June 2016, so the defense had ample time to interview and discover what the child might say at trial. Because Noor cannot show that the State suppressed potentially exculpatory evidence, his *Brady* challenge fails.

Dkt. 10, Ex. 3 at 44-47.

The Washington Supreme Court also addressed this claim in its ruling denying

review in the context of Petitioner's PRP, stating:

Mr. Noor next argues that the State violated its disclosure obligation under *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), by not revealing an interview of Mr. Noor's child (age six at the time) by a Child Protective Services caseworker, in which the child said he had not witnessed any violence in the home and that his "mom" was named [H.] and was 25 years old. The same caseworker had also interviewed "[H.]" who claimed at the time that she was really S.K. and was 16 years old. But before trial defense counsel was aware of the child and the possibility he would provide helpful testimony because Mr. Noor had asked counsel to speak with the child on the belief he would corroborate Mr. Noor's version of events, and counsel knew the child was in CPS custody and sought the prosecutor's cooperation in reaching the child. Mr. Noor presents no evidence that defense counsel could not have interviewed the child. No *Brady* violation is committed if the defendant possesses the salient facts regarding the existence of the evidence the defendant claims was withheld, and with reasonable diligence could have obtained the information at issue. *State v. Mullen*, 171 Wn,2d 881, 903, 259 P.3d 158 (2011); *State v. Lord*, 161 Wn.2d 276, 293, 165 P.3d 1251 (2007); *In re Pers, Restraint of Gentry*, 137 Wn.2d 378, 396, 972 P.2d 1250 (1999). Mr. Noor urges that there is no affirmative "due diligence" requirement under Brady. *See Dennis v. Sec y, Pennsylvania Dep't of Corr.*, 834 F.3d 263, 290 (3d Cir. 2016). But the question in this context is not whether defense counsel had an affirmative duty to seek out the information the State withheld, but whether information was equally available to defense counsel in the exercise of due diligence based on what counsel already knew. *See State v. Davila*, 184 Wn.2d 55, 73, 73 n.4, 357 P.3d 636 (2015) (noting defense counsel had no reason to pursue a line of inquiry that would have revealed undisclosed information, distinguishing cases, like *State v. Mullen* and *Gentry* above, where counsel failed to pursue obvious lines of inquiry given what was disclosed). Here, as indicated, defense counsel expressed his intent to interview the child based on his understanding the child would support Mr. Noor's version of events. That information was readily available to counsel and was an obvious line of inquiry based on what he knew. Mr. Noor demonstrates no error.

REPORT AND RECOMMENDATION - 23

Dkt. 10, Ex. 18 at 837-38.

The Supreme Court in *Brady v. Maryland*, 373 U.S. 83 (1963), held the prosecution's failure to disclose material evidence to a criminal defendant violates the defendant's right to a fair trial. *Id.*; *Cunningham v. Wong*, 704 F.3d 1143, 1154 (9th Cir. 2013). In order to state a claim under *Brady*, "a criminal defendant must establish that (1) the withheld evidence was favorable to the defendant; (2) the government suppressed the evidence; and (3) the government's suppression prejudiced the defendant." *Cunningham*, 704 F.3d at 1154 (citing *Smith v. Almada*, 640 F.3d 931, 939 (9th Cir.2011) (applying the *Brady* test). Evidence is considered favorable to the defendant if it is either exculpatory or impeaching. *United States v. Price*, 566 F.3d 900, 907 (9th Cir. 2009); *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)).

A line of Circuit court cases, including cases in the Ninth Circuit hold "[u]nder *Brady's* suppression prong, if the defendant is aware of the essential facts enabling him to take advantage of any exculpatory evidence, the government's failure to bring the evidence to the direct attention of the defense does not constitute suppression." *Cunningham*, 704 F.3d at 1154 (internal citation and quotation marks omitted); *United States v. Dupuy*, 760 F.2d 1492, 1501 n. 5 (9th Cir. 19 F.2d 682, 689 (9th Cir. 1986); *United States v. Shaffer*, 789 F.2d 682, 690 (9th Cir. 1986) (A *Brady* claim will not lie where defense counsel was "aware of the essential facts enabling [the defendant] to take advantage of any exculpatory evidence."). Similarly, the Eleventh Circuit has held, in rejecting a *Brady* argument based on failure to disclose the statement of a witness, that, since the prosecution disclosed the *identity* of the witness, "defendants ... had within their knowledge the information by which they could have ascertained the supposed *Brady* material," and therefore, "there is no suppression by the government." *United States v. Griggs*, 713 F.2d 672, 674 (11th Cir. 1983); *and see Williams v. Scott*, 35 F.3d

1   159, 163 (5th Cir. 1994) ("A *Brady* violation does not arise if the defendant, using reasonable

2   diligence, could have obtained the information."); *United States v. Brown*, 582 F.2d 197, 200 (2d

3   Cir.), *cert. denied*, 439 U.S. 915 (1978) ("[W]here the defendant is aware of the essential facts

4   enabling him to take advantage of any exculpatory evidence, the Government does not commit a

5   *Brady* violation by not bringing the evidence to the attention of the defense. Where a witness is

6   involved, "(t)he government is not required to make a witness' statement known to a defendant

7   who is on notice of the essential facts which would enable him to call the witness and thus take

8   advantage of any exculpatory testimony that he might furnish" (*quoting United States v. Stewart*,

9   513 F.2d 957, 960 (2d Cir. 1975)).[8]

10      Petitioner fails to show the courts' decision rejecting Petitioner's *Brady* claim was

11  contrary to or an unreasonable application of clearly established federal law or an unreasonable

12  determination of the facts. Petitioner argues the state courts applied the incorrect standard under

13  *Brady* and therefore AEDPA-deference does not apply. Specifically, Petitioner argues contrary

14  to the state courts' findings and its reliance on another state court decision in *Mullens*, *Brady*

15  does not impose an affirmative "due diligence" requirement on the defense and the Supreme

16  Court has never recognized an affirmative due diligence requirement as a part of *Brady*.

17  However, Petitioner fails to show the state courts' citation to and reliance on *Mullens*, and

18  analysis under *Brady*, was contrary to or an unreasonable application of *Brady*. *Mullens*

19  expressly cites and discusses *Brady* as well as case law from the federal circuit courts (some of

20  which is cited above) interpreting the suppression prong under *Brady* to conclude there is no

21

22

23

---

[8] Although Supreme Court precedent provides the only relevant source of clearly established federal law for AEDPA purposes, circuit precedent can be "persuasive authority for purposes of determining whether particular state court decision is an 'unreasonable application' of Supreme court law," and in ascertaining "what law is 'clearly established.'" *Duhaime v. Ducharme*, 200 F.3d 597, 600–01 (9th Cir. 2000).

suppression where a defendant is aware of the essential facts enabling him to take advantage of any exculpatory evidence.

In light of the case law discussed above, the Court finds the state courts did not apply an incorrect standard in analyzing Petitioner's *Brady* claim and reasonably rejected Petitioner's argument that *Brady* does not impose an affirmative "due diligence" requirement on the defendant in stating "the question in this context is not whether defense counsel had an affirmative duty to seek out the information the State withheld, but whether information was equally available to defense counsel in the exercise of due diligence based on what counsel already knew." Dkt. 10, Ex. 18 at 837-38. The Court notes that Petitioner cites to no United States Supreme Court precedent, nor is the Court aware of any, directly holding that a *Brady* violation occurs even where the defendant is aware of essential facts enabling him to take advantage of any exculpatory evidence.

In his response to Respondent's answer, Petitioner cites to *Amado v. Gonzalez*, 758 F.3d 1119 (9th Cir. 2014) to support his position that the state courts either applied an incorrect standard in analyzing Petitioner's *Brady* claim or that their decision was contrary to or an unreasonable application of *Brady*. Dkt. 13 at 12. In *Amado*, the evidence at issue was a probation report of a key witness who testified at trial against the defendant, Amado. *Amado*, 758 F.3d at 1128. The probation report disclosed the witness had pleaded guilty to committing a robbery, that he was on probation for that offense, and that he had been a member of a gang that was a rival of the gang the defendant allegedly belonged to. *Id.* at 1128, 1139. The California state Court of Appeal had ruled the defendant's *Brady* claim failed because Amado did not establish "an inability to discover and produce the evidence at trial, with the exercise of

due diligence." In finding the state Court of Appeals' requirement of due diligence to be contrary

to or an unreasonable application of *Brady*, the Ninth Circuit stated that:

> The [California state] Court of Appeal's requirement of due diligence would flip that obligation, and enable a prosecutor to excuse his failure by arguing that defense counsel could have found the information himself. The proposition is contrary to federal law as clearly established by the Supreme Court, *see Early*, 537 U.S. at 8, 123 S.Ct. 362, and unsound public policy. Especially in a period of strained public budgets, a prosecutor should not be excused from producing that which the law requires him to produce, by pointing to that which conceivably could have been discovered had defense counsel expended the time and money to enlarge his investigations. No *Brady* case discusses such a requirement, and none should be imposed. *See Banks*, 540 U.S. at 691, 124 S.Ct. 1256 (setting forth the essential elements of a *Brady* claim).

*Amado*, 758 F.3d at 1136–37.

But *Amado* did not address a circumstance where the defendant was aware of the

essential facts enabling him to take advantage of any exculpatory evidence. Rather, there is no

indication in *Amado* that the defense had any reason to be aware of the existence or contents of

the probation report. Furthermore, although the defense had an opportunity to interview the

witness and did not do so, the *Amado* court pointed out that "[i]t is not likely that an interview of

[the witness] would have disclosed the facts the State suppressed[.]" Thus, the term "due

diligence" as discussed by the state Court of Appeals in this case, is distinguishable from the

"due diligence" requirement imposed by the state Court of Appeals in *Amado* and which the

Ninth Circuit found the application of to be contrary to or an unreasonable application of *Brady*.[9]

---

[9] Petitioner also cites to *Dennis v. Sec'y*, 834 F.3d 263, 290 (3d Cir. 2016) and *Fontenot v. Crow*, 4 F.4th 982, 1066 (10th Cir. 2021) in support his argument that the state suppressed evidence under *Brady*, and that the state Court of Appeals' decision in this case was unreasonable. While it is not clear that either of these cases actually addresses the same or similar factual circumstance as is presented in this case, they do appear to take a stronger stance that evidence is suppressed under *Brady* regardless of whether defense counsel "knew or should have known" about the information. *See Fontenot*, 4 F.4th at 1066. But even assuming the Third and Tenth Circuits take a different approach on this issue, the Court is not persuaded, in light of the case law from other Circuits discussed above, that the state court's rejection of Petitioner's *Brady* claim in this case was contrary to or an unreasonable application of clearly established federal law, or an unreasonable determination of the facts. At a minimum, the Court finds that "'fairminded jurists could disagree' on the correctness of the state court's decision" here and, as such, federal habeas relief is precluded. *Harrington*, 562 U.S. at 101.

REPORT AND RECOMMENDATION - 27

1          Here, as the state court found, the record shows that as of August 2015, the defense was

2    on notice Petitioner's child was in CPS's custody, was confident it could "work something out"

3    with CPS, and was aware the child would "have a very different understanding of events and

4    [would] be able to corroborate [Petitioner's] side of the story." Dkt. 10, Ex. 15 at 657-658. As

5    the state court noted, the trial did not begin until June 2016, so the defense had ample time to

6    interview and discover what the child might say at trial. Petitioner's own declaration submitted

7    in support of his PRP states that he informed his first defense attorney, Jonathan Lewis, to

8    interview his son informing counsel that his son "would be a good witness for [Petitioner]

9    because he was often present in the apartment with [S.K.] and [Petitioner] and would verify that I

10   did not assault or rape [S.K.]." Dkt. 10, Ex. 14 at 534. Petitioner also states that when his new

11   defense attorney, Timothy Leary, took over the case he also "asked him to interview [his son]

12   and … asked him to contact his dependency lawyers to gain information about his case that may

13   not have been disclosed by the criminal prosecutors[.]" *Id.*, Ex. 14 at 535.

14         Based on these facts the state court could reasonably conclude, as they did, that "trial

15   defense counsel was aware of the child and the possibility he would provide helpful testimony

16   because Mr. Noor had asked counsel to speak with the child on the belief he would corroborate

17   Mr. Noor's version of events, and counsel knew the child was in CPS custody and sought the

18   prosecutor's cooperation in reaching the child", "defense counsel expressed his intent to

19   interview the child based on his understanding the child would support Mr. Noor's version of

20   events" and "[t]hat information was readily available to counsel and was an obvious line of

21   inquiry based on what he knew." Based on this record, the state court could reasonably conclude

22   the defendant was aware of the essential facts enabling him to take advantage of any exculpatory

23

evidence, and therefore the government's failure to bring the evidence of the interview to the direct attention of the defense did not constitute suppression under *Brady*.

Furthermore, viewing M.N.'s statement in the context of the entire record, Petitioner fails to show prejudice as required under *Brady*. Evidence is prejudicial or material[10] under *Brady* "'only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Kohring*, 637 F.3d at 912 (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). The petitioner has the "burden of showing that withheld evidence is material [,]" *United States v. Si*, 343 F.3d 1116, 1122 (9th Cir. 2003), and this Court must assess whether the withheld evidence is material "in the context of the entire record." *United States v. Agurs,* 427 U.S. 97, 112 (1976); *United States v. Jernigan,* 492 F.3d 1050, 1054 (9th Cir. 2007) (en banc).

The record here shows that, at trial, the only statement S.K. made regarding M.N.'s presence during any physical abuse was that, in response to the prosecutor's question whether M.N. was "ever around when [Petitioner] hit [S.K.]", she stated "[d]aytime he was present, but the night time, most of the time it was when he was sleeping." Dkt. 10, Ex. 25 at 1609. The record shows that CPS workers spoke to M.N. in June and August of 2015. On June 3, 2015, the record reflects M.N. told CPS he did not know whether his mom [referring to S.K.] had been locked out of their apartment a few days earlier and denied his mom and dad ever "got mad at each other." *Id.*, Ex. 14 at 475. In the August 6, 2015, interview, the record shows M.N. stated his stepmom [referring to S.K.] was named H.A. and that she was 25 years old and that he knew this because she had told him this "when she came to this country." *Id.*, Ex. 14 at 477, 564-71;

---

[10] For purposes of *Brady*, "material" and "prejudicial" have the same meaning. *United States v. Kohring*, 637 F.3d 895, 902 (9th Cir. 2011 (citing *Benn v. Lambert*, 283 F.3d 1040, 1053 (9th Cir. 2002).

1    Dkt. 14. During that interview the record shows CPS also asked M.N. whether "anybody get[s]

2    hit when they get in trouble?" to which M.N. answered "No" and when asked whether

3    "[a]nything happen[s] at home that your stepmom [referring to S.K.] doesn't like?" M.N.

4    answered "No." *Id.*, Ex. 14 at 564-71; Dkt. 14. The Court also notes that M.N. was only six years

5    old when he was interviewed by CPS and was recounting events from when he was at most six

6    years old or younger.

7           Here, viewing M.N.'s statement in the context of the entire record, the statements M.N.

8    made to CPS workers would have, at best, presented a minor challenge to S.K.'s overall

9    credibility, but did not directly contradict the evidence supporting the specific charges for which

10   Petitioner was convicted, many of which were at least partly corroborated by other evidence at

11   trial. S.K. did not allege M.N. witnessed the assault or rape for which Petitioner was charged, nor

12   did M.N. state in his interviews that he was present at the time of these alleged events, or the

13   other events for which Petitioner was charged with crimes, and that these events did not, in fact,

14   occur. Furthermore, the record shows that S.K.'s testimony regarding the charged assault,

15   Petitioner's aggressive behavior toward S.K. after the assault, and S.K.'s fear of Petitioner after

16   the assault, was at least partly, and significantly, corroborated by the testimony of Ifrah Noor and

17   her mother, as well as evidence from the police officer who took pictures of S.K.'s injuries, and

18   the hospital records reflecting evidence of bruising or contusions in the days after the assault.

19   Dkt. 10, Ex. 24 at 1417 (testimony from police officer taking pictures of S.K.'s injuries that she

20   was able to see marks on S.K.), 1486 (testimony that medical records reflected an assessment of

21   "multiple contusions"), 1541-42 (testimony of Ifrah Noor that S.K. asked her not to leave her

22   with Petitioner after she locked herself out of the apartment because he would either beat her or

23   kill her and that the day after the assault S.K. appeared at Ifrah Noor's door "crying, begging,

1    throwing up blood, and blood was falling from her nose"), 1541-52 (testimony from Ifrah Noor

2    that the day after the assault Petitioner followed her car with his car as she was driving with S.K.

3    and her own mother, that Petitioner was driving aggressively to try get her to pull over and when

4    she pulled over he tried to enter the car through the window "wanting to hit [S.K.] from behind",

5    that S.K. was crying and afraid and did not want to get out of the car saying she was scared and

6    that Petitioner would beat her or kill her), 1577-81 (similar testimony of Ifrah Noor's mother

7    regarding incident in the car).[11] The record shows the no contact order violation charges were

8    also corroborated by surveillance video evidence as well as by testimony from the police officer

9    responding to S.K.'s call regarding "Moussa's" attempt to contact S.K. and pick up M.N.

10          Viewed in the context of the entire record, Petitioner fails to show M.N.'s very general

11    statements to CPS workers in response to their very general questions, even assuming they were

12    admitted and/or remained consistent if he was called as a witness at trial, would have directly or

13    significantly undermined the testimony and corroborating evidence of the specific crimes in this

14    case for which Petitioner was convicted, or that they would have significantly undermined S.K.'s

---

[11] The Court also notes that Petitioner fails to show that the fact that M.N. stated he knew his "mom" or "stepmom" as H.A., and that she told him she was 25 years old significantly undermines S.K.'s testimony or credibility such that there is a reasonable probability this evidence would have changed the outcome of the proceeding. S.K. testified that Petitioner forced her to adopt the name H.A. and the 1990 date of birth and to hide her true identity when it was decided she would be joining Petitioner in the United States, and that Petitioner was insistent she hold herself out as this identity. In light of this testimony, the Court cannot conclude that it would necessarily be inconsistent for S.K. to also identify herself by this name and age to six-year-old M.N. In fact, M.N.'s statement that he knew his "mom" or "stepmom" as H.A. and that she was 25 years old because she told him so *when she came to the United States*, appears to be consistent with her testimony that she adopted this new name and date of birth at Petitioner's insistence for purposes of coming to and living in the United States as Petitioner's wife. The Court also notes that S.K.'s testimony also indicated she began adopting the identity of H.A., wife of Petitioner, date of birth in 1990, as part of the immigration process quite a while before she actually came to the United States, when M.N would have been even younger. *See* Dkt. 10, Ex. 25 at 1597-1601. Furthermore, as previously noted, whether the identity of the victim as S.K. or H.A. was not an element of any of the crimes for which Petitioner was actually convicted. In sum, Petitioner fails to show that there is a reasonable probability this evidence would have changed the outcome of the proceeding.

REPORT AND RECOMMENDATION - 31

1    credibility. Thus, the Court finds Petitioner fails to show a reasonable probability that, had the

2    evidence been disclosed to the defense, the result of the proceeding would have been different.

3         In sum, Petitioner fails to show that the state courts' rejection of his *Brady* claim was

4    contrary to or an unreasonable application of clearly established federal law, an unreasonable

5    determination of the facts, or that he is otherwise entitled to habeas relief on this claim.

6    Accordingly, Ground Two should be denied.

7         3.    *Ground Three*

8         In Ground Three, Petitioner argues the trial court's "constant admonitions" of the jury

9    were unduly coercive and violated due process and the right to a jury trial under U.S. Const.

10   amends. VI and XIV. Petitioner points to several comments by the trial judge to the jury (and use

11   of examples where jurors were sanctioned) emphasizing that they should refrain from discussing

12   the case outside of deliberations, refrain from conducting outside research, and avoiding wasting

13   taxpayer time by engaging in these actions and thereby creating potential grounds for a mistrial.

14   Specifically, Petitioner points to the following statements by the trial court:

15       In Pennsylvania a judge ordered a juror to provide one of the attorneys with
16   printouts of websites she visited during trial. And she may face criminal contempt
     charges for conducting prohibited internet research. The juror was a high school librarian.
     She used the internet to research a particular kind of injury. She claimed through her
17   court appointed lawyer that she misunderstood the judge's instruction not to conduct
     outside research. She thought the judge was only referring to the facts of the case, not
18   related issues. You know better.
         *When cases end up in a mistrial or get overturned because of jurors doing*
19   *internet research, or visiting the scenes of any particular action, or violating the Court's*
     *instruction, it's bad for the parties. They have to start all over*
20   *again. It's bad for the system because it's – our system of justice is at stake. It's bad for*
     *the taxpayers because the taxpayers foot the bill for all these things.* So please keep that
     in mind.
21   RP at 311-12 (emphasis added).
     …
22
         Here is what happened in New York last November. A juror's Facebook status
23   said the juror was quote, in trouble. A working mother employed by J.P. Morgan was
     sitting as a juror in a case. The judge had admonished the jurors not to communicate via
     social media about the case. The juror posted, sometimes twice a day. One of her

Facebook friends blew the whistle on her. The dismissal of the juror resulted in a mistrial, which cost the taxpayers thousands of dollars, travel for witnesses, costs for everything that went on in the court and the attorneys time. The judge found her in contempt of court, and fined her $1,000, which is pretty minor, all things considered. So the consequences, as I have told you repeatedly, are really harmful to the system, not to mention to all of the people involved.

RP 438-39 (emphasis added). *See also* RP 517 (judge relates story about a juror in North Carolina who was sentenced to 30 days in jail for misconduct); RP 635 & 666 (judge relates story about juror in Great Britain sentenced to three months confinement and how the juror complained to the European Court of Human Rights but lost); RP 688 (other stories about jurors convicted of juror misconduct).

Dkt. 5 at 16-17 and n. 12 (citing Dkt. 10, Ex. 23 at 1201-02, Ex. 24 at 1331-32, 1410, Ex. 25 at 1531, 1562, 1584).

The Court of Appeals addressed and rejected this claim in the context of Petitioner's PRP. Specifically, the court stated:

Noor contends the trial court's admonitions to the jury violated his right to a jury free from external influences. He argues the court "repeatedly threatened the jurors with jail sentences, tying the threat to the costs of a mistrial." This argument lacks merit.

Prior to some of the breaks at trial, the trial court reminded the jury of "how important it is for you to keep your minds free of outside information, or influence, not only about the facts in this case, but about anything having to do with the subject matter of this case." The court further explained "the only way the parties in this case get a fair trial is if you are open minded and keep your minds free of outside information until you begin your deliberations." The court gave examples from across the nation in which well-intentioned jurors engaged in such misconduct. Noor even acknowledges that the "motivation of the trial judge in this case was undoubtedly to prevent jurors from obtaining outside information about the case or otherwise violating the court's instructions." We have not found any instances in the record where the trial court threatened the jury.

Again, it is Noor's burden to establish actual prejudice from what he contends were the trial judge's admonitions. Because he has not shown any such prejudice, his claim must be denied.

Dkt. 10, Ex. 3 at 39.

In denying review in the context of the PRP, the Washington Supreme Court also rejected this claim, stating:

Mr. Noor next argues that the trial court coerced the jurors by frequently admonishing them to not conduct their own research into the facts of the case or talk with anyone about the case, warning them of the possibility of a mistrial and the inconvenience and expense that would cause, and giving examples from other states and

> countries where jurors were sanctioned or jailed for contempt for conducting research outside trial. But the court simply drove home to the jury in stark terms the need to follow its obligation to not look beyond the evidence at trial in making its decision, Mr. Noor doesn't show that by these admonitions the court "threatened" the jurors or likely "coerced" them into reaching a verdict in order to avoid a hung jury, as he claims.

*Id.*, Ex. 18 at 838.

"Any criminal defendant ... being tried by a jury is entitled to the uncoerced verdict of that body." *Lowenfield v. Phelps*, 484 U.S. 231, 241 (1988). A jury instruction is "unconstitutionally coercive if it denies the defendant the due process right to a trial by a fair and impartial jury." *DeWeaver v. Runnels*, 556 F.3d 995, 1007 (9th Cir. 2009). In determining whether a jury was improperly coerced by a trial court's statements, the reviewing court must consider the challenged events "in [their] context and under all the circumstances." *Jenkins v. United States*, 380 U.S. 445, 446 (1965). "In a federal habeas proceeding, a claim of jury coercion requires the habeas court to ask: (1) whether the state court looked at the totality of the circumstances in determining if the instruction was coercive; and (2) whether that court's determination on the coercion question was reasonable." *Patterson v. California*, 2022 WL 958376, at *3 (N.D. Cal. Mar. 30, 2022) (citing *Parker v. Small*, 665 F.3d 1143, 1148 (9th Cir. 2011)).

Petitioner first argues, again, the state courts' ruling is not entitled to AEDPA-deference "since it neither addresses long-held federal constitutional standards nor actually even analyze [sic] the claim at all." For the same reasons discussed above, the Court finds that Plaintiff's arguments fail to rebut the presumption that Petitioner's claim was decided on the merits, and that the state courts' decision is entitled to AEDPA-deference. *See supra* at Section B.1.

Turning to the merits, the Court has reviewed the entire record and concludes the record shows the state court, in rejecting Petitioner's claims, looked at the totality of the circumstances, and reasonably determined the trial court's challenged statements to the jury were not unduly

REPORT AND RECOMMENDATION - 34

1  coercive. Petitioner's arguments primarily challenge the trial judge's generalized comments to

2  the jury (and use of examples where jurors were sanctioned) emphasizing that they should refrain

3  from discussing the case outside of deliberations, refrain from conducting outside research, and

4  avoiding wasting taxpayer time by engaging in these actions and thereby creating potential

5  grounds for a mistrial. Petitioner points to nothing to indicate bias on the part of the trial judge in

6  making the challenged statements to the jury. Moreover, Petitioner's arguments that these

7  generalized comments and examples may have somehow coerced the jury into rendering a

8  verdict of guilt, as opposed to an acquittal or a hung jury, are entirely speculative and fail to

9  establish error by the state courts.

10      In sum, Petitioner fails to show that the state courts' rejection of his jury-coercion claims

11  was contrary to or an unreasonable application of clearly established federal law, an

12  unreasonable determination of the facts, or that he is otherwise entitled to habeas relief on this

13  claim. Accordingly, Ground Three should be denied.

14      4.    *Ground Four*

15      In Ground Four, Petitioner argues his separate convictions and sentences for Count 6

16  (harassment) and Count 7 (intimidating a witness) violate the prohibition against Double

17  Jeopardy protected by U.S. Cons. amends. V & XIV. Dkts. 1, 5. More specifically, Petitioner

18  argues his conviction for misdemeanor harassment, a lesser included offense within Count 6, and

19  witness intimidation, charged in Count 7, were based on the same threat he made to S.K, and

20  therefore violated Double Jeopardy. Dkt. 5 at 21-24.

21      The Court of Appeals rejected this claim on direct appeal, stating:

22          Noor contends the jury conviction for misdemeanor harassment of S.K. and the
            conviction for intimidation of S.K. as a witness violate double jeopardy because the
            convictions are based on the same threat.
23          A defendant may raise a double jeopardy claim for the first time on appeal and
            we review the claim de novo. *State v. Mutch*, 171 Wn.2d 646, 661-62, 254 P.3d 803

(2011). The Fifth Amendment to the United States Constitution and article 1, section 9 of the Washington Constitution protects a defendant from multiple punishments for the same offense. *Mutch*, 171 Wn.2d at 661.

Where multiple counts charge the same crime against the same victim and occur during the same period, the court should instruct the jury that each count requires proof of a "separate and distinct" act. *Mutch*, 171 Wn. 2d at 662-63.

Here, the trial court did not instruct the jury that each count must be based on a separate and distinct criminal act. But the failure to do so only creates the potential for a double jeopardy violation. *Mutch*, 171 Wn.2d at 663. There is no double jeopardy violation where the information, testimony, argument, and instructions make it "'manifestly apparent'" to the jury that the State was not seeking to impose multiple punishments for the same offense. *Mutch*, 171 Wn.2d at 663[12] (quoting *State v. Berg*, 147 Wn. App. 923, 931, 198 P.3d 529 (2008)).

In determining whether it was manifestly apparent to the jury that the State was not seeking multiple punishments for the same offense, we may review the entire record before the trial court. *Mutch*, 171 Wn.2d at 664; *see also State v. Peña Fuentes*, 179 Wn.2d 808, 824, 318 P.3d 257 (2014) ("On review, the court may consider insufficient instructions 'in light of the full record' to determine if the instructions 'actually effected a double jeopardy error.'") (quoting *Mutch*, 171 Wn.2d at 664).

Misdemeanor harassment and intimidation of a witness are different in law because each crime "required proof of a fact that the other did not." *State v. Meneses*, 169 Wn.2d 586, 594, 238 P.3d 495 (2010). Misdemeanor harassment requires proof that the victim had a reasonable fear the defendant would carry out the threat.[13] RCW 9A.46.020(2)(a), (1)(b). Intimidation of a witness requires proof that the victim is a witness and the defendant made the threat because of the victim's role as a witness.[14] 9 RCW 9A.72.110.

Noor claims the convictions violated double jeopardy because proof of the two crimes "relied on a single threat." The record does not support Noor's argument.

---

[12] [FN 7 by Court of Appeals] Emphasis omitted.

[13] [FN 8 by Court of Appeals] Jury instruction 26 states, in pertinent part:
To convict the defendant of the lesser crime of harassment in count VI, each of the following four elements of the crime must be proved beyond a reasonable doubt:
(1) That between July 11, 2015 and August 6, 2015, the defendant knowingly threatened to cause bodily injury immediately or in the future to S.K.;
(2) That the words or conduct of the defendant placed S.K. in reasonable fear that the threat would be carried out;
(3) That the defendant acted without lawful authority; and
(4) That the threat was made or received in the State of Washington.

[14] [FN 9 by Court of Appeals] Jury instruction 28 states, in pertinent part:
To convict the defendant of the crime of intimidating a witness, each of the following elements of the crime must be proved beyond a reasonable doubt:
(1) That between July 11, 2015, and August 7, 2015, the defendant by use of a threat against a current or prospective witness attempted to
(a) influence the testimony of that other person; or
(b) induce that person to absent herself from an official proceeding; or
(c) induce that person not to give truthful or complete information relevant to a criminal investigation; or
(d) induce that person not to have the crime prosecuted; and
(2) That the acts occurred in the State of Washington.

The record shows the State did not rely on the same threat. S.K. testified about two separate threats. S.K. testified that after CPS took custody of M.N., Noor demanded S.K. "try to get [M.N.] back" from CPS or he would send men to "make [her] dead." S.K. testified that Noor forced her to ask the court to lift the no-contact order against him and say Noor "didn't do anything." When the court did not lift the no-contact order, Noor told S.K. to tell the attorney that "[Noor] didn't hit [her]" and told S.K., "If you don't follow what I tell you, you will not be alive."

In closing argument, the prosecutor made clear the threats were separate and distinct. First, the prosecutor addressed the evidence for felony harassment of S.K., count VI:

> The defendant's also charged with harassing [S.K.]. . . .
>
> And you heard from Judge Mack the stipulation; that the defendant was in jail between July 6th and July 11, 2015. And when he got out, he started back up again. So the harassment started when he got out of jail.
>
> And this is when he calls [S.K.], or he sees [S.K.], and he threatens to kill her if she doesn't return his child. He says I'm going to give the men pictures of you, and they're going to come and kill you. Again, I don't have to just prove that he made the threat, but that [S.K.] was reasonably afraid.... [S.K.] would be reasonably afraid of the defendant after everything that he had done, after everything he had done to her, after everything he had done to Ifrah, after his refusal to follow the court orders, his total indifference to the fact that he was in trouble. Didn't stop him from doing this. She had every reason to be afraid that he was going to carry out that threat. In fact he talked about how it doesn't matter, men in America, they have pistols, they can do this.

Second, the prosecutor addressed the evidence for intimidation of S.K. as a witness, count VII:

> Finally there's the Intimidating a Witness charge. And this is pretty straight forward. It's the same time period, between July 11 and August 7th, again, when the defendant was out of custody. And that he is using threats to get [S.K.] to take back her testimony, to try to not cooperate with the prosecution, to not come to court. He told her, don't come to court. He told her to call his lawyer and change her statement. And that if she didn't, that something worse would happen.... [H]e threatened to hurt her, or kill her, if she didn't do what he's asking, basically to make the case go away. And for that reason he's Intimidating a Witness.

Based on the entire record, because it was manifestly apparent to the jury that the charges for felony harassment and intimidation of a witness were not based on a single threat, there is no double jeopardy violation.

Dkt. 10, Ex. 2 at 29-32.

The Double Jeopardy Clause guarantees no person shall "be subject of the same offense to be twice put in jeopardy of life or limb." U.S. Const. amend V. It affords three basic protections: "'[It] protects against a second prosecution for the same offense after acquittal. It

1  protects against a second prosecution for the same offense after conviction. And it protects

2  against multiple punishments for the same offense.'" *Ohio v. Johnson*, 467 U.S. 493, 498 (1984)

3  (quoting *Brown v. Ohio,* 432 U.S. 161, 165 (1977) (other citations omitted)). In both the multiple

4  punishment and multiple prosecution contexts, the Supreme Court has concluded that where the

5  two offenses for which the defendant is punished or tried cannot survive the "same-elements"

6  test, the double jeopardy bar applies. *See, e.g., Brown*, 432 U.S. at 168-169; *Blockburger v.*

7  *United States*, 284 U.S. 299, 304 (1932) (multiple punishment); *Gavieres v. United States*, 220

8  U.S. 338, 342 (1911) (successive prosecutions). Under the "same elements" test set forth in

9  *Blockburger*, "double jeopardy exists if the second offense contains elements identical to, or

10 included as a subset within, the elements of the former charge." *United States v. Wright*, 79 F.3d

11 112, 114 (9th Cir. 1996). "The same-elements test, sometimes referred to as the

12 "*Blockburger*" test, inquires whether each offense contains an element not contained in the other;

13 if not, they are the "same offence" and double jeopardy bars additional punishment and

14 successive prosecution." *United States v. Dixon*, 509 U.S. 688, 696 (1993); *See U.S. v. Overton*,

15 573 F.3d 679, 692 (9th Cir. 2009) (Where "each statutory provision requires proof of an

16 additional fact the other does not, violations . . . are not the same offense under *Blockburger*, and

17 we presume that Congress intended to permit multiple punishments for a single act or

18 transaction.").

19     However, an offender may be charged, convicted, and sentenced for multiple offenses

20 without violating the Double Jeopardy Clause. *Garrett v. United States*, 471 U.S. 773, 779

21 (1985). Where consecutive sentences are imposed at a single trial, the Double Jeopardy Clause

22 does no more than prevent the sentencing court from prescribing greater punishment than the

23 legislature intended. *Id*. at 794; *Missouri v. Hunter*, 459 U.S. 359, 366 (1983).

1    Before a federal habeas court can overturn a state court conviction based upon an

2 alleged instructional error, a petitioner must demonstrate that the alleged error violated a right

3 guaranteed by the Constitution. *Cupp v. Naughten*, 414 U.S. 141, 146 (1973). A challenged

4 instruction must be considered in the context of the instructions as a whole and the trial

5 record. *Estelle v. McGuire*, 502 U.S. 62, 72 (1991) (citing *Cupp*, 414 U.S. at 147.) The proper

6 inquiry in reviewing ambiguous jury instructions is "'whether there is a reasonable likelihood

7 that the jury has applied the challenged instruction in a way' that violates the Constitution." *Id.*

8 (quoting *Boyde v. California*, 494 U.S. 370, 380 (1990)). Where a challenge involves the failure

9 to give an instruction, the burden of demonstrating that an instructional error was so prejudicial

10 that it will support a collateral attack on the constitutional validity of a state court judgment is

11 "especially heavy" because "[a]n omission, or an incomplete instruction is less likely to be

12 prejudicial than a misstatement of the law." *Henderson v. Kibbe*, 431 U.S. 145, 154-55 (1977).

13    Here, as the state court found, the crimes Petitioner was charged and convicted of are set

14 forth in separate statutes and contain different elements, each statutory provision requiring proof

15 of an additional fact the other does not. Specifically, Petitioner was convicted of misdemeanor

16 harassment, which requires proof that the victim had a reasonable fear the defendant would carry

17 out the threat, and Petitioner was convicted of intimidation of a witness which requires proof that

18 the victim is a witness, and the defendant made the threat because of the victim's role as a

19 witness. *See* RCW 9A.46.020(2)(a), (1)(b); 9 RCW 9A.72.110.

20    Furthermore, as the state court reasonably found, the record made clear Petitioner's

21 convictions for these two separate crimes were not, as Petitioner argues, based upon the same

22 threat. Rather, for the reasons outlined by the state court in its decision rejecting Petitioner's

23 claim, despite the trial court's failure to specifically instruct the jury that each count must be

1    based on a separate and distinct criminal act, viewing the record as a whole, it was "manifestly

2    apparent to the jury that the charges for felony harassment and intimidation of a witness were

3    not based on a single threat." Dkt. 10, Ex. 2 at 29-32. Specifically, the record supports the state

4    court's findings that S.K. testified about two separate threats: (1) that after CPS took custody of

5    M.N., Petitioner demanded S.K. "try to get [M.N.] back" from CPS or he would send men to

6    "make [her] dead"; and (2) S.K. testified that Petitioner forced her to ask the court to lift the no-

7    contact order against him and say Petitioner "didn't do anything" and when the court did not lift

8    the no-contact order, Petitioner told S.K. to tell the attorney that Petitioner didn't hit her and told

9    S.K., "If you don't follow what I tell you, you will not be alive." Dkt. 10, Ex. 26 at 1645-56,

10   1661-62. The record further supports the state court's finding that during closing argument the

11   prosecutor made clear that the threats supporting the two separate charges were separate and

12   distinct. Dkt. 10, Ex. 26 at 1824-46.

13        To the extent Petitioner argues the failure to give the jury instruction that each count must

14   be based on separate and distinct criminal act violated double jeopardy, he cites to no United

15   States Supreme Court precedent, nor is the Court aware of any, holding that a jury instruction

16   must include this specific language in order to avoid double jeopardy concerns. *See Thompson v.*

17   *Haynes*, No. C21-5342-BJR-SKV, 2021 WL 6693201, at *6 (W.D. Wash. Nov. 10, 2021), *report*

18   *and recommendation adopted*, 2022 WL 226097 (W.D. Wash. Jan. 26, 2022) (rejecting similar

19   claim and noting that Petitioner failed to "cite to any United States Supreme Court precedent

20   holding that a jury instruction must include specific language requiring each count to rest upon

21   a separate and distinct act in order to avoid double jeopardy concerns."). Furthermore, the Court

22   of Appeals reviewed the record as a whole and concluded that the lack of this instruction did not

23   violate Petitioners right to be free from double jeopardy and this conclusion is consistent with,

1  and amply supported by, the record before this Court. Viewing the jury instructions and the

2  record as a whole, for the same reasons discussed above, Petitioner fails to show there is even a

3  reasonable likelihood that due the absence of this instruction, the jury subjected Petitioner to

4  multiple punishments for the same offense, in violation of double jeopardy, and the Court finds

5  the state court reasonably rejected Petitioner's double jeopardy claim.

6       Petitioner has failed to show the state court's finding that the convictions for both

7  misdemeanor harassment (Count 6) and intimidating a witness (Count 7) did not violate double

8  jeopardy principles was contrary to, or involved an unreasonable application of, clearly

9  established federal law, was based on an unreasonable determination of the facts, or that he is

10  otherwise entitled to habeas relief on this claim.  Accordingly, Ground Four should be denied.

11       5.    *Ground Five*

12       In Ground Five, Petitioner argues his separate convictions and sentences for Counts II, III

13  and VIII (violation of court order counts) violate the prohibition against Double Jeopardy

14  protected by U.S Cons. amends. V & XIV. Dkts. 1, 5. Petitioner argues his violations of the no-

15  contact orders were one continuous offense and therefore his three separate convictions violated

16  double jeopardy. Dkt. 5 at 24-26. He contends "the evidence was that there was essentially an

17  entire summer of persistent violations of the NCOs, and the State did not clearly separate out the

18  no contact order allegations in closing argument." *Id.* Petitioner also argues the jury's question to

19  the trial court regarding what "on or about" meant indicated they were unclear about what the

20  dates of the charged no contact order violations were and whether each count overlapped with

21  the others. *Id.* Petitioner also argues there was no language in the instructions for Counts 2, 3,

22  and 8 that required the jury to determine separate and distinct acts for each count. *Id.*

23

The Court of Appeals rejected this claim in the context of denying Petitioner's PRP. The state court held:

> The Fifth Amendment to the United States Constitution and article I, section 9 of the Washington State Constitution protect a defendant from multiple punishments for the same offense. *State v. Hall*, 168 Wn.2d 726, 729-30, 230 P.3d 1048 (2010). "If a defendant is charged with violating the same statutory provision more than once, multiple convictions can withstand a double jeopardy challenge only if each is a separate 'unit of prosecution.'" *State v. Allen*, 150 Wn. App. 300, 313, 207 P.3d 483 (2009) (quoting *State v. Turner*, 102 Wn. App. 202, 206, 6 P.3d 1226 (2000)). We have previously made clear that:
>
>> RCW 26.50.110(1) punishes "a violation" of a no-contact order. Use of the word "a" supports the State's reading that the unit of prosecution is each single violation of a no-contact order. The Supreme Court "has consistently interpreted the legislature's use of the word 'a' in a criminal statute as authorizing punishment for each individual instance of criminal conduct, even if multiple instances of such conduct occurred simultaneously."
>
> *State v. Brown*, 159 Wn. App. 1, 10-11, 248 P.3d 518 (2010) (quoting *State v. Ose*, 156 Wn.2d 140, 147, 124 P.3d 635 (2005)); *Allen*, 150 Wn. App. at 313-14 (each act of sending an e-mail constituted a statutory violation).
>
> Each day Noor contacted S.K., whether by entering her apartment building himself, or by having Moussa do so, he committed a separate violation. Consequently, Noor's three convictions of violation of a no-contact order did not violate double jeopardy protections.[15]
>
> We also reject Noor's argument that he engaged in a single, "continuous course of contact [of S.K.] in June, July and August 2015." He relies on *State v. Spencer*, 128 Wn. App. 132, 114 P.3d 1222 (2005), for the proposition that violation of a no contact order is a continuing crime. But his reliance on *Spencer* is misplaced. In *Brown*, we clarified that, "[t]he Spencer court simply determined the scope of one particular contact that lasted several minutes. It did not hold that repeated contacts were continuing." *Brown*, 159 Wn. App. at 13.

Dkt. 10, Ex. 3 at 43-44; *see also* Dkt. 10, Ex. 18 at 838-39 (Washington Supreme Court's ruling denying review summarily rejecting Petitioner's claims of double jeopardy).

Petitioner fails to demonstrate the state court's rejection of his double jeopardy claim was contrary to or an unreasonable application of clearly established law or an unreasonable determination of the facts. Petitioner identifies no clearly established United States Supreme Court precedent, nor is the Court aware of any, indicating that the use of "on or about" language

---

[15] [FN 5 by Court of Appeals] Given our disposition of this claim, we reject Noor's claim that his counsel provided ineffective assistance for not raising the issue at trial or on appeal.

1    in charging documents, jury instructions, or during opening and closing argument, to identify the

2    time frame in which an alleged offense occurred, necessarily implicates double jeopardy where

3    separate offenses are alleged to have occurred "on or about" different dates. Petitioner also

4    identifies no clearly established United States Supreme Court precedent, nor is the Court aware

5    of any, stating that no-contact order violations, or other criminal violations, occurring on or

6    about different dates within several days or months of one another, constitute a "continuous

7    course of conduct" that may only be charged as one offense, and cannot be charged separately

8    without implicating double jeopardy concerns.

9            Furthermore, the record here reflects that charging documents clearly distinguished the

10   three separate counts of no-contact order violations based on separate dates which were a

11   minimum of four days to up to almost two months apart. *See* Dkt. 10, Ex. 18 at 298-302 (Second

12   Amended Information alleging Petitioner violated the terms of a court order protecting S.K. "on

13   or about" June 4, 2015 (count two), "on or about" June 8, 2015 (count three), and "on or about"

14   July 31, 2015 (count eight)). The record shows the prosecution presented evidence at trial that

15   supported each separate charge. Specifically, evidence was presented in the form of surveillance

16   video from S.K.'s apartment building showing Petitioner entering the building on June 4, 2015,

17   at 10:53 a.m., leaving at 11:39 a.m., and arriving back again the same day at 11:21 p.m. *See* Dkt.

18   10, Ex. 25 at 1517-23. The prosecution also presented surveillance video evidence showing

19   Petitioner arriving at the apartment on June 8, 2015, at 2:47 a.m., and leaving with his son at

20   8:35 a.m. the same morning. *Id.*, Exhibit 25, at 1523-24. Evidence of these violations was also

21   supported by S.K.'s testimony that Petitioner continued to stay at the apartment after the initial

22   no-contact order was issued. *Id.*, Ex. 26 at 1641-45.

23

REPORT AND RECOMMENDATION - 43

1      And with respect to the third offense, the record shows that S.K. testified that she had

2  received a call from a number she did not recognize and a man whose voice she did not

3  recognize told her that Petitioner said if she did not give up his son in 30 minutes, "then what  --

4  what happen to you, it's up to you." Dkt. 10, Ex. 26 at 1658-59. S.K. further testified that

5  thereafter a man she did not recognize came to her apartment door and she took a picture of him

6  and called the police. *Id.* The police officer responding to that call testified that he responded to a

7  911 call from S.K. on July 31, 2015, and that when he arrived at S.K.'s apartment, the man was

8  still present at or around the apartment. Dkt. 10, Ex. 24 at 1315-1329. The officer testified that

9  upon interviewing the man, who identified himself as "Moussa", Moussa indicated that he knew

10  the Petitioner and that the Petitioner had given him paperwork from D.S.H.S. which Moussa

11  believed authorized him to go to S.K.'s apartment and get the Petitioner's child. *Id.* The officer

12  testified that the form Moussa presented did not address the no-contact order and merely said

13  that "the allegation of abuse was closed." *Id.*

14      The record further reflects that during closing argument the prosecutor argued these three

15  separate events as discrete and separate offenses. Dkt. 10, Ex. 26, at 1821-22, 1826. Finally, the

16  record shows that the relevant jury instructions, numbered 11, 12, and 32, clearly informed the

17  jury that to convict the Petitioner of each offense, it must find that he violated the terms of a

18  court order "on or about" three separate dates, June 4, 2015 (count 2), June 8, 2015 (count 3),

19  and July 31, 2015 (count eight). *See* Dkt. 10, Ex. 26 at 1780-82, 1792-93; Dkt. 10 Ex. 14 at 324-

20  25, 347.

21      Petitioner also points to the jury's inquiry regarding what "on or about" meant and argues

22  this indicated the jury was unclear about what the dates of the charged no-contact order

23

1    violations were, and whether each count overlapped with the others.[16] Dkt. 5 at 24-27; Dkt. 10,

2    Ex.14 at 369. But the record does not reflect that this inquiry was related specifically to the no-

3    contact order charges as other charges also included this language. Furthermore, Petitioner's

4    argument that the jury's question demonstrated they were unclear about what the dates of the

5    charged no contact order violations were and whether each count overlapped with the others, is

6    largely speculative as there is no evidence to indicate that this was, in fact, the jury's concern. In

7    light of the fact that the record as a whole, including the evidence, prosecutor's arguments, and

8    jury instructions reflected that each count represented separate and distinct acts, Petitioner fails

9    to show that this inquiry from the jury implicates a double jeopardy concern, much less that the

10    state court's rejection of Petitioner's double jeopardy claim was contrary to, or involved an

11    unreasonable application of, clearly established federal law, or was based on an unreasonable

12    determination of the facts.

13       Finally, to the extent Petitioner argues the trial court failed to give the jury instruction

14    that each count must be based on a separate and distinct criminal act, he again cites to no United

15    States Supreme Court precedent, nor is the Court aware of any, holding that a jury instruction

16    must include this specific language in order to avoid double jeopardy concerns. *See Thompson*,

17    2021 WL 6693201, at *6. Furthermore, the Court of Appeals reviewed the record and rejected

18    Petitioner's double jeopardy claim, implicitly concluding the absence of this instruction did not

19    violate Petitioners right to be free from double jeopardy, and the state court's conclusion is

20    consistent with, and amply supported by, the record before this Court. Viewing the jury

21    instructions and the record as a whole, in light of the clarity of the charging document, jury

22

23

---

[16] The Court's response to this question was that the jury should "rely on the instructions you've been provided." Dkt. 10, Ex.14 at 369.

REPORT AND RECOMMENDATION - 45

instructions, and argument that each count referred to a separate occurrence on or about a different date, as well as evidence in the record of separate violations occurring on the dates provided, Petitioner fails to show there is even a reasonable likelihood that, due the absence of this instruction, the jury subjected Petitioner to multiple punishments for the same offense, in violation of double jeopardy. The Court finds the state court reasonably rejected Petitioner's double jeopardy claim.[17]

In sum, Petitioner has failed to show the state court's rejection of his double jeopardy claim related to Counts 2, 3, and 8, was contrary to, or involved an unreasonable application of, clearly established federal law, was based on an unreasonable determination of the facts, or that he is otherwise entitled to habeas relief on this claim. Accordingly, Ground Five should be denied.

6.    *Ground Six*

In Ground Six, Petitioner argues there was insufficient evidence for Count 8, violation of a court order, in violation of due process of law as protected by the Fourteenth Amendment and *Jackson v. Virginia*, 443 U.S. 307 (1979).

The Constitution forbids the criminal conviction of any person except upon proof of guilt beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 364 (1970). When evaluating a claim of insufficiency of the evidence to support a conviction, the reviewing court must decide "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319. "*Jackson* leaves juries broad discretion in deciding what inferences to draw from the

---

[17] The Court notes that the record does reflect that the trial court did instruct the jury that: "A separate crime is charged in each count. You must decide each count separately. Your verdict on one count should not control your verdict on any other count." Dkt. 10, Ex. 26 at 1779.

REPORT AND RECOMMENDATION - 46

evidence presented at trial, requiring only that jurors 'draw reasonable inferences from basic

facts to ultimate facts.'" *Coleman v. Johnson*, 132 S.Ct. 2060, 2064 (2012) (quoting *Jackson*,

443 U.S. at 419). The jury is entitled to believe the State's evidence and to disbelieve the

defense's evidence. *Wright v. West*, 505 U.S. 277, 296 (1992).

      In deciding Petitioner's PRP, the Court of Appeals concluded the evidence was sufficient

to convict Petitioner on Count 8, stating:

> Noor claims there is insufficient evidence to convict him for one of the counts of misdemeanor violation of a no-contact order.
>
> "Sufficiency of the evidence is a question of constitutional magnitude because due process requires the State to prove its case beyond a reasonable doubt." *In re Pers. Restraint of Tortorelli*, 149 Wn.2d 82, 93, 66 P.3d 606 (2003) (citing *State v. Baeza*, 100 Wn.2d 487, 488, 670 P.2d 646 (1983)). "When the sufficiency of the evidence is challenged in a criminal case, all reasonable inferences from the evidence must be drawn in favor of the State and interpreted most strongly against the defendant" and "[a] claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom." *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). "Circumstantial evidence and direct evidence carry equal weight when reviewed by an appellate court." *State v. Trey M.*, 186 Wn.2d 884, 905, 383 P.2d 474 (2016). We defer to the trier of fact on issues of witness credibility. *State v. Witherspoon*, 180 Wn.2d 875, 883, 329 P.3d 888 (2014).
>
> Noor was convicted on count VIII of misdemeanor violation of a court order, arising from Noor directing Ali Moussa to call and later knock on the door of S.K.'s residence on July 31, 2015. The to-convict instruction set forth four elements of this crime. For the jury to convict, the State was required to prove beyond a reasonable doubt: (1) That on or about July 31, 2015, there existed a no-contact order, for the protection of S.K., applicable to the defendant; (2) That the defendant knew of the existence of this order; (3) That on or about said date, the defendant knowingly violated a provision of this order which was a restraint provision of the order prohibiting contact with a protected party or a provision of the order excluding the defendant from a residence; and (4) That the defendant's act occurred in the State of Washington.
>
> Noor does not dispute elements 1, 2, and 4 of the charged crime. A July 2015 no-contact order prohibited Noor from contacting S.K. "directly, indirectly, in person or through others, by phone, mail, or electronic means." Noor argues there was no evidence that he directed Moussa to contact S.K. on July 31, 2015, "only that Moussa was trying to retrieve Noor's son."
>
> S.K. testified about "a time where Mr. Noor sent someone else" to her house. She spoke about receiving a call from a man who implied that Noor "said if you don't give [Noor's child up] in 30 minutes, then ... what happen[s] to you, it's up to you." Shortly thereafter, a man S.K. did not know knocked on her apartment door and she called the police. A police officer testified to responding to S.K.'s apartment on July 31, 2015 and interviewing S.K. and a man who identified himself as Moussa. Moussa told the officer that he and Noor were acquainted from their mosque and Noor had given him some paperwork authorizing the child to be removed from the apartment.

REPORT AND RECOMMENDATION - 47

1

2

> This evidence was sufficient for the jury to find beyond a reasonable doubt
> that Noor, through Moussa's actions, indirectly contacted S.K. on July 31 in violation of
> the no-contact order.

3    Dkt. 10, Ex. 3 at 40-41; *see also* Dkt. 10, Ex. 18 at 838-39 (Washington Supreme Court's ruling

4    denying review summarily rejecting Petitioner's insufficiency of the evidence claim).

5          Here, the evidence, when viewed in the light most favorable to the prosecution, was

6    constitutionally sufficient to support the jury's verdict of violation of a court order. As charged in

7    this case, the crime of violation of a court order required proof: (1) that on or about July 31,

8    2015, there existed a No Contact Order for the protection of S.K., applicable to the defendant; (2)

9    that the defendant knew of the existence of this order; (3) that on or about said date, the

10   defendant knowingly violated a provision of this order, which was a restraint provision of the

11   order prohibiting contact with the protected party, or a provision of the order excluding the

12   defendant from a residence; (4) that the defendant's act occurred in the State of Washington. *See*

13   Dkt. 10 Ex. 26 at 1792-93; RCW 26.50.110(1)[18]; Dkt. 10, Ex.14 at 301, 347 (Second Amended

14   Information & Jury Instructions). Petitioner does not appear to dispute here, and did not appear

15   to dispute in his PRP, that there was a no-contact order in place during the relevant period for the

16   protection of S.K., applicable to Petitioner.[19] Furthermore, the record shows that S.K. testified

17

18   [18] The version of RCW 26.50.110(1) in effect during the relevant period provided, in relevant part:
         Whenever an order is granted under this chapter, chapter 7.92, 7.90, 9A.46, 9.94A, 10.99,
         26.09, 26.10, 26.26, or 74.34 RCW, any temporary order for protection granted under
19       chapter 7.40 RCW pursuant to chapter 74.34 RCW, or there is a valid foreign protection
         order as defined in RCW 26.52.020, and the respondent or person to be restrained knows
20       of the order, a violation of any of the following provisions of the order is a gross
         misdemeanor, except as provided in subsections (4) and (5) of this section:
21       (i) The restraint provisions prohibiting acts or threats of violence against, or stalking of, a
         protected party, or restraint provisions prohibiting contact with a protected party;
         (ii) A provision excluding the person from a residence, workplace, school, or day care[.]
22

23   [19] The record also indicates that evidence was presented at trial that there was a no-contact order in place
     during the relevant period for the protection of S.K., applicable to Petitioner, that prohibited Petitioner
     from contacting S.K. "directly, indirectly, in person or through others, by phone, mail, or electronic
     means." Dkt. 10, Ex. 14 at 450, Ex. 24 at 1315-1329, Ex. 26 at 1764, 1826.

1   that she had received a call from a number she did not recognize and a man whose voice she did

2   not recognize told her that Petitioner said if she did not give up his son in 30 minutes, "then what

3   -- what happen to you, it's up to you." Dkt. 10, Ex. 26 at 1658-59. S.K. further testified that

4   thereafter a man she did not recognize came to her apartment door and she took a picture of him

5   and called the police. *Id.* The police officer responding to that call testified that he responded to a

6   911 call from S.K. on July 31, 2015, and that when he arrived at S.K.'s apartment, a man was

7   present at or around the apartment. Dkt. 10, Ex. 24 at 1315-1329. The officer testified that upon

8   interviewing the man, who identified himself as "Moussa", Moussa indicated that he knew the

9   Petitioner and that the Petitioner had given him paperwork from D.S.H.S. which Moussa

10  believed authorized him to go to S.K.'s apartment and get the Petitioner's child. *Id.* The officer

11  testified that the form Moussa presented did not address the no-contact order and merely said

12  that "the allegation of abuse was closed." *Id.*

13      Petitioner argues that while he "may have asked someone to pick up his son" this is not

14  "sufficient evidence that [Petitioner] asked Mr. Moussa to contact S.K" because "the focus was

15  on retrieving his son, not contacting [S.K.]." Dkt. 5 at 29. However, based on the evidence

16  above, the Court finds there was sufficient evidence for a rational jury, drawing reasonable

17  inferences from the evidence presented, to conclude Petitioner asked Moussa to contact S.K. and

18  sent him to her apartment, and ultimately that Petitioner committed the charged crime of

19  violation of a court order.

20      Petitioner fails to demonstrate the state court's conclusion that there was sufficient

21  evidence for the jury to determine Petitioner was guilty of violation of a court order (Count 8)

22  was contrary to, or an unreasonable application of, clearly established federal law, was an

23

1   unreasonable determination of the facts in light of the evidence presented at trial, or that he is

2   otherwise entitled to habeas relief on this claim.  Accordingly, Ground Six should be denied.

3           7.      *Ground Seven*

4           In Ground Seven, Petitioner alleges ineffective assistance of trial and appellate counsel

5   on several bases. Specifically, Petitioner alleges:

> Mr. Noor received ineffective assistance of counsel at trial and on direct appeal in
> violation of the right to counsel and right to due process of law protected by the Sixth and
> Fourteenth Amendments, *Strickland v. Washington*, 466 U.S. 668 (1984), and *Evitts v.
> Lucey*, 469 U.S. 387 (1985).
>
> Trial counsel did not find out on his own that DSHS/CPS and the police had exculpatory
> information in their possession regarding M.K.'s interview. Trial counsel proposed one
> instruction that used the pseudonym "S.K." for instead of "H.A." or the complainant's
> real name, and did not except to the other instructions using S.K. and did not object when
> the judge identified the complainant to the jury at the beginning of the trial as "S.K." with
> a 1998 birth date. Counsel failed to argue that multiple counts either were the "same
> criminal conduct" or that convictions for all counts violated double jeopardy. Counsel did
> not object to the trial judge telling the jury stories about the other jurors found in
> contempt.
>
> Trial counsel also did not submit mitigating evidence to the sentencing judge – evidence
> of extreme trauma in Mr. Noor's life – that should have been considered when deciding
> what minimum term he should receive. Trial counsel also did not explain to Mr. Noor in
> a way that he could understand the jeopardy he faced if he turned down a deal of a few
> years in prison and went to trial and lost – i.e. that he would receive an indeterminate life
> sentence with a very long minimum term – and thus Mr. Noor was not able meaningfully
> to participate in the plea bargaining phase of the case.
>
> On appeal, counsel did not raise challenges to the use of the pseudonym "S.K." and 1998
> birth date in the oral and written instructions to the jury, nor did counsel raise the same
> criminal conduct or double jeopardy claims regarding Counts 2, 3 and 8, nor did counsel
> raise issues involving the trial count's coercive statements to the jurors.

19  Dkts. 1, 5 at 30.

20          The Court of Appeals rejected Petitioner's ineffective assistance claims in the context of

21  denying Petitioner's PRP, stating:

> To prevail on an ineffective assistance claim, Noor must show that his counsel's
> performance fell below an objective standard of reasonableness and that the deficient
> performance prejudiced him. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct.
> 2052, 80 L. Ed. 2d 674 (1984); *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d
> 1251 (1995). "When counsel's conduct can be characterized as legitimate trial strategy or

tactics, performance is not deficient." *State v. Kyllo*, 166 Wn.2d 856, 86, 215 P.3d 177 (2009). To show prejudice, Noor "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. If Noor meets his burden to show ineffective assistance under *Strickland*, then he has necessarily met his burden to show the actual and substantial prejudice the PRP standard requires. *In re Pers. Restraint of Crace*, 174 Wn.2d 835, 846-47, 280 P.3d 1102 (2012). However, if he fails to satisfy either prong of the test, we need not inquire further. *State v. Hendrickson*, 129 Wn.2d 61, 78, 917 P.2d 563 (1996).

We approach ineffective assistance of counsel arguments with a strong presumption that counsel provided effective and competent representation. *State v. McNeal*, 145 Wn.2d 352, 362, 37 P.3d 280 (2002). A petitioner "can 'rebut this presumption by proving that his attorney's representation was unreasonable under prevailing professional norms and that the challenged action was not sound strategy'" and the "'reasonableness of counsel's performance is to be evaluated from counsel's perspective at the time of the alleged error and in light of all the circumstances.'" *In re Pers. Restraint of Davis*, 152 Wn.2d 647, 673, 101 P.3d 1 (2004) (quoting *Kimmelman v. Morrison*, 477 U.S. 365, 384, 106 S. Ct. 2574, 91 L. Ed. 2d 305 (1986)).

1. Use of Initials

Noor argues that his trial counsel was ineffective for not objecting to the court's use of S.K.'s initials in the jury instructions. But, since we have already determined there was no instructional error, Noor's claim that his counsel was ineffective for failing to challenge those instructions also fails because he has not shown that counsel's performance was deficient or resulted in actual prejudice. *Hendrickson*, 129 Wn.2d at 78.

2. Sentencing

Next, Noor claims his counsel was ineffective at sentencing for not presenting evidence that Noor experienced civil war as a child growing up in Somalia. Defense counsel's obligation to provide effective assistance applies at sentencing. *State v. Phuong*, 174 Wn. App. 494, 547, 299 P.3d 37 (2013). At sentencing, the State argued that Noor "stole [S.K.'s] childhood from her" and requested a sentence at the higher end of the standard range, even though Noor had no criminal history. Noor's counsel responded by requesting the shortest sentence within the standard range be imposed. Counsel highlighted Noor's love for his young child and his support from members in the local Somali community. One such member appeared and spoke positively on Noor's behalf. Counsel also submitted many more letters from the community as mitigation evidence.[20] During allocution, Noor declared: "I never did any of this," "I never used her as a wife," and "I'm her uncle[,] I never used her." He then continued attacking the trial proceedings, denied committing the offenses for which he was convicted, and disparaged his attorney's trial tactics and strategies. Noor squandered the opportunity to share his civil war experiences and how they impacted his life. Ultimately, the trial court imposed a standard range sentence between the sentences the parties recommended. Noor fails to demonstrate that the actions of his counsel at sentencing fell below objective standards of effective representation. Nor has he shown a reasonable probability that, but for his counsel's performance at the sentencing hearing, the court would have imposed a shorter sentence. This is so because even a "poor quality sentencing argument alone is unlikely to result in demonstrable prejudice because of the near impossibility of showing a nexus between the argument and the eventual sentence." *State v. Goldberg*, 123 Wn. App. 848, 853, 99 P.3d 924 (2004). Noor's ineffective assistance at sentencing claim fails.

---

[20] [FN 6 by Court of Appeals] None of the community letters are part of the record on collateral review.

3. Failure to Discover CPS Interview

Noor contends that his counsel provided ineffective assistance by failing to discover and subpoena the August 2015 CPS interview of his child M.N.

Again, we approach this claim with the strong presumption that counsel's representation was effective and that Noor bears the burden to rebut this strong presumption by "'proving that his attorney's representation was unreasonable under prevailing professional norms and that the challenged action was not sound strategy.'" *Davis*, 152 Wn.2d at 673 (quoting *Kimmelman*, 477 U.S. at 384). But, from the record, it appears defense counsel made an informed tactical decision not to interview Noor's child, call the child as a witness, or subpoena the child's CPS records.

Believing that his child would be a good witness and verify that he neither assaulted nor raped S.K., Noor asked his first defense counsel to interview the child. Noor says that attorney tried to arrange an interview with the child but was unsuccessful. When another attorney took over the defense as trial counsel, Noor asked him to interview the child. Noor asked his new defense counsel "to contact my dependency lawyers to gain information about my case that may not have been disclosed by the criminal prosecutors. I do not know why [defense counsel] never contacted the dependency lawyers and why he did not interview" the child.

As discussed above, Noor's defense counsel did reach out to the State to coordinate an interview with Noor's child M.N. The interview never occurred. Defense counsel was also unaware of the CPS interview of M.N. While the record does not explain why defense counsel decided not to interview or call M.N. as a witness, "the decision to call or not to call a witness is for counsel to make." *In re Pers. Restraint of Stenson*, 142 Wn.2d 710, 16 P.3d 1 (2001).

In closing argument, defense counsel argued that the State simply failed to meet its burden of proof. Counsel informed the jury that Noor's child was on his "list of missing witnesses" whom the State did not call to testify and cautioned that Noor's "decision to follow my advice to not testify cannot be held against him ... This is about the State's case, what they chose to present, also quite significantly, what they chose not to present."

On this record, we conclude defense counsel had no intention of making Noor's child a trial witness and, therefore, had no need for any material contained in the child's CPS file. Noor has not shown defense counsel rendered ineffective assistance here.

4. Plea Offer

Finally, Noor argues his counsel was ineffective because he did not understand the consequences of refusing the State's plea offer. The right to effective assistance of counsel extends to the plea negotiation process. *State v. Estes*, 188 Wn.2d 450, 463, 395 P.3d 1045 (2017). This right to effective counsel "includes 'assisting the defendant in making an informed decision as to whether to plead guilty or to proceed to trial.'" *Estes*, 188 Wn.2d at 464 (quoting *State v. A.N.J.*, 168 Wn.2d 91, 111, 225 P.3d 956 (2010)). Before trial Noor rejected the State's plea offers, indicating that he "wasn't willing to consider several years in prison." He went to trial, where the jury convicted him of multiple charges including a second degree rape charge that carries an indeterminate life sentence. Now, Noor claims that he "did not understand the plea bargaining process fully" and "did not knowingly and intelligently give up the opportunity to plead guilty to a lesser charge, that would have meant him serving just a few years in prison." Noor admits that his defense counsel communicated the State's offers and "attempted to explain to [him] what the sentencing consequences were." Noor does not claim that his counsel failed to advise about the sentencing consequences if convicted on the second

degree rape charge. Because he fails to present evidence indicating that his counsel's performance was deficient, Noor's claim fails.

Dkt. 10, Ex. 3 at 47-52; *see also* Dkt. 10, Ex. 18 at 838-39 (Washington Supreme Court's ruling denying review summarily rejecting Petitioner's claims of ineffective assistance of counsel).

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court created a two-part test for determining whether a defendant received ineffective assistance of counsel. First, a defendant must demonstrate his attorney's performance was deficient, which requires showing "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id.* at 687. Second, a defendant must demonstrate the deficient performance prejudiced the defense to such a degree the results of the trial cannot be trusted. *Id.*

Under the first prong, the reasonableness of an attorney's performance is to be evaluated from counsel's perspective at the time of the alleged error and in light of all the circumstances. *Id.* at 690. A petitioner must carry a heavy burden, as reviewing courts "must indulge a strong presumption that counsel's conduct falls within the wide range of professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* at 689 (citation omitted).

Under the prejudice prong, a petitioner must establish there is a reasonable probability the results would have been different but for counsel's deficient performance. *Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986); *Strickland*, 466 U.S. at 696. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. The reviewing court need not address both components of the *Strickland* inquiry if an insufficient showing is made on one component. *Id*. at 697.

In regard to failure to investigate, defense counsel has a "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."

REPORT AND RECOMMENDATION - 53

1   *Id.* at 691. Counsel has a duty to investigate the defendant's "most important defense," *Sanders v.*

2   *Ratelle*, 21 F.3d 1446, 1457 (9th Cir. 1994), "and a duty adequately to investigate and introduce

3   into evidence records that demonstrate factual innocence, or that raise sufficient doubt on that

4   question to undermine confidence in the verdict." *Bragg v. Galaza*, 242 F.3d 1082, 1088 (9th Cir.

5   2001) (citing *Hart v. Gomez*, 174 F.3d 1067, 1070 (9th Cir. 1999)). The Ninth Circuit has found,

6   however, "the duty to investigate and prepare a defense is not limitless: it does not necessarily

7   require that every conceivable witness be interviewed." *Hendricks v. Calderon*, 70 F.3d 1032,

8   1040 (9th Cir. 1995) (citations and quotations omitted). "When the record clearly shows that the

9   lawyer was well-informed, and the defendant fails to state what additional information would be

10  gained by the discovery she or he now claims was necessary, an ineffective assistance claim fails."

11  *Bragg*, 242 F.3d at 1088. Additionally, "ineffective assistance claims based on a duty to investigate

12  must be considered in light of the strength of the government's case." *Eggleston v. U.S.*, 798 F.2d

13  374, 376 (9th Cir. 1986).

14          While the Supreme Court established in *Strickland* the legal principles that govern claims

15  of ineffective assistance of counsel, it is not the role of the federal habeas court to evaluate

16  whether defense counsel's performance fell below the *Strickland* standard. *Harrington v.*

17  *Richter*, 562 U.S. 86, 101 (2011). Rather, when considering an ineffective assistance of counsel

18  claim on federal habeas review, "[t]he pivotal question is whether the state court's application of

19  the *Strickland* standard was unreasonable." *Id*. As the Supreme Court explained in *Harrington*,

20  "[a] state court must be granted a deference and latitude that are not in operation when the case

21  involves review under the *Strickland* standard itself." *Id*. Judicial review of a defense counsel's

22  performance is, therefore, "doubly deferential when conducted through the lens of federal

23  habeas." *Yarborough v. Gentry*, 540 U.S. 1, 6 (2003).

1    Petitioner concedes that to the extent the Court finds his claims related to double

2  jeopardy, the use of pseudonyms, and coercive trial court statements (Grounds 1, 3, 4, and 5) fail

3  on the merits, his ineffective assistance of counsel claims premised upon those underlying claims

4  also necessarily fail. Dkt. 5 at 30-31; Dkt. 9 at 45; Dkt. 13 at 22. As the Court has found that all

5  of these claims (Grounds 1, 3, 4, and 5) fail on the merits, and Petitioner concedes these claims

6  therefore necessarily fail and presents no separate argument supporting his ineffective assistance

7  claims independent of the underlying substantive claims, the Court finds that Petitioner's related

8  ineffective assistance claims also fail and should be denied.

9    Petitioner's remaining ineffective assistance claims alleging counsel provided ineffective

10  assistance in failing to find out about the CPS interview of M.K., failing to submit mitigating

11  evidence during sentencing, and failing to explain the plea options in a way that Petitioner could

12  understand, as well as Petitioner's ineffective assistance of appellate counsel claims, are

13  addressed in turn below.

14    a.    *Failure to Investigate and Discover CPS Interview of M.N.*

15    Petitioner argues defense counsel rendered ineffective assistance of counsel by failing to

16  investigate and discover the CPS interview of Petitioner's son, M.N.

17    Petitioner fails to show the state courts' rejection of this claim was contrary to or an

18  unreasonable application of clearly established federal law or an unreasonable determination of the

19  facts. As noted above reviewing courts "must indulge a strong presumption that counsel's conduct

20  falls within the wide range of professional assistance; that is, the defendant must overcome the

21  presumption that, under the circumstances, the challenged action might be considered sound trial

22  strategy." *Strickland*, 466 U.S. at 689 (citation omitted). Here, the state courts reasonably found

23  that Petitioner failed to rebut the strong presumption that the failure to pursue interviewing M.N.,

1  call M.N. as a witness, or pursue discovery related to M.N.'s CPS file, might be considered sound

2  trial strategy.

3         As the state court found, the record shows Petitioner submitted a declaration indicating that

4  he asked his first defense counsel to interview M.N. and that he informed counsel that he believed

5  M.N. would "be a good witness for [Petitioner] because he was often present in the apartment with

6  [S.K.] and Petitioner and would verify that [Petitioner did not assault or rape [S.K.]." Dkt. 10, Ex.

7  14 at 534-35. Petitioner further states that when another defense attorney took over his case, he

8  again asked him to interview M.N. and "to contact my dependency lawyers to gain information

9  about my case that may not have been disclosed by the criminal prosecutors." *Id.* The record

10  shows that Petitioner's first defense counsel did reach out to the State about coordinating an

11  interview with M.N. but that the interview never occurred, and that defense counsel was not

12  aware of the CPS interview with M.N. that had been conducted. Dkt. 10, Ex. 15 at 655-57.

13  Finally, the record reflects, that in closing argument, defense counsel argued that the State

14  simply failed to meet its burden of proof. Dkt. 10, Ex. 26 at 1833-1850. Defense counsel

15  indicated that M.N. was on his "list of missing witnesses" whom the State did not call to testify,

16  cautioned the jury that Petitioner's "decision to follow my advice to not testify cannot be held

17  against him" and argued that "[t]his is about the State's case, what they chose to present, also

18  quite significantly, what they chose not to present." *Id.* at 1840-41, 1849.

19         On this record the Court finds the state court could reasonably conclude that defense

20  counsel made an informed tactical decision not to interview Petitioner's son M.N., to call the

21  child as a witness, or to subpoena the child's CPS records. The state court could reasonably

22  conclude, based on the record, that defense counsel was aware that Petitioner wanted defense

23  counsel to interview his son on the grounds that he believed his son would back up his version of

1    events, but that defense counsel chose to pursue the tactic of emphasizing that the prosecution

2    had failed to meet their burden of proof, including highlighting the fact that the prosecution had

3    failed to call Petitioner's son to testify. The Court also notes that M.N. was only six years old

4    and defense counsel could very reasonably have been concerned about the risks of putting such a

5    young child on the stand and what M.N. might in fact say on the stand, particularly when subject

6    to cross-examination, despite Petitioner's assertions that he believed M.N. would support his side

7    of the story or testify that no rape or physical abuse occurred.[21] On this record, the state court

8    could reasonably conclude that Petitioner failed to rebut the strong presumption that defense

9    counsel's actions might be considered sound trial strategy.

10        Furthermore, the statements M.N. made to CPS workers did not directly contradict the

11    evidence supporting the specific charges for which Petitioner was convicted. As discussed above

12    in Ground Two, the record shows that, at trial, the only statement S.K. made regarding M.N.'s

13    presence during any physical abuse was that, in response to the prosecutor's question whether

14    M.N. was "ever around when [Petitioner] hit [S.K.]", she stated "[d]aytime he was present, but

15    the night time, most of the time it was when he was sleeping." Dkt. 10, Ex. 25 at 1609. The

16    record shows that CPS workers spoke to M.N. in June and August 2015. On June 3, 2015, the

17    record reflects that M.N. told CPS he did not know whether his mom [referring to S.K.] had been

18    locked out of their apartment a few days earlier and denied his mom and dad ever "got mad at

19    each other." *Id.*, Ex. 14 at 475.  In the August 6, 2015, interview, the record shows M.N. stated

---

[21] The Court notes that, in support of his PRP, Petitioner submitted a declaration from Petitioner's second
defense attorney, Timothy Leary, which states, in relevant part, only that to the best of his knowledge he
never saw the CPS/DSHS records related to M.N.'s interviews with CPS/DSHS and that to the best of his
knowledge the State did not disclose the records or disclose information regarding what M.N. said to
CPS/DSHS workers. Dkt. 10, Ex. 14 at 10-2. Counsel does not state that had he been aware of this
information he would have done anything differently or pursued a different trial tactic. No declaration
from Petitioner's first defense attorney, John Lewis, appears to have been submitted in support of the PRP
or elsewhere in the record.

his stepmom [referring to S.K.] was named H.A. and that she was 25 years old and that he knew

this because she had told him this "when she came to this country." *Id.*, Ex. 14 at 477, 564-71;

Dkt. 14. During that interview the record shows CPS also asked M.N. whether "anybody get[s]

hit when they get in trouble?" to which M.N. answered "No" and when asked whether

"[a]nything happen[s] at home that your stepmom [referring to S.K.] doesn't like?" M.N.

answered "No." *Id.*, Ex. 14 at 564-71; Dkt. 14.

 For the same reasons set forth in analyzing Petitioner's *Brady* claim in Ground Two,[22]

and in view of the context of the entire record, Petitioner fails to show that M.N.'s very general

statements to CPS workers in response to their very general questions, even assuming they were

admitted and/or remained consistent if he was called as a witness at trial, would have directly, or

significantly, undermined the testimony and corroborating evidence of the specific crimes in this

case for which Petitioner was convicted, or significantly undermined S.K.'s credibility. Thus, the

Court finds Petitioner fails to show a reasonable probability the results of the proceeding would

have been different but for defense counsel's failure to interview M.N., to call him as witness, or

to subpoena M.N.'s CPS records.

 In sum, Petitioner fails to show the state courts' rejection of this claim was contrary to or

an unreasonable application of clearly established federal law, an unreasonable determination of

the facts, or that he is otherwise entitled to habeas relief on this claim.

 b. *Failure to Present Mitigating Evidence at Sentencing*

 Petitioner argues defense counsel provided ineffective assistance in failing to present

evidence at sentencing that Petitioner had witnessed violence as a child in Somalia. In support of

his claim Petitioner presents a declaration, submitted in support of his PRP, in which he states:

---

[22] *See supra* at Section B.2. at 29-32 (discussion of failure to show prejudice under *Brady*).

> I was born in Somalia in 1983. I was a child when the civil war broke out. I have a lot of memories of what took place and the violence that I witnessed....
>
> In 1991, when I was seven years old, I was with my mother at my aunt's house in Mogadishu, the capital of Somalia. My aunt had gone to the market to buy meat. The kitchen of the house was separated from the main living area. I remember my mother was walking in the area between the kitchen and the house, carrying food, when at least three men came into the yard and started firing their guns. I saw my mother get shot. She was yelling at me to get down. She came over to me, bleeding, and laid on top of me, and died. One of my aunt's children was also killed during this incident....
>
> It was after I saw my mother killed that my aunt took me to Kenya. As we were fleeing from Mogadishu, I saw a lot of other violence where armed bands shot and killed others who were on the road. We ended up in a refugee camp in Kenya.

Dkt. 10, Ex. 16 at 726-27.

The Ninth Circuit has determined that "the Supreme Court has clearly established that *Strickland* governs claims for ineffective assistance of counsel in noncapital sentencing proceedings." *Daire v. Lattimore*, 818 F.3d 454, 457 (9th Cir. 2016). "In assessing prejudice, [in the context of assessing an ineffective assistance claim at sentencing] we reweigh the evidence in aggravation against the totality of available mitigating evidence." *Wiggins v. Smith*, 539 U.S. 510, 534 (2003). "The likelihood of a different result must be substantial, not just conceivable." *Apelt v. Ryan*, 878 F.3d 800, 832 (9th Cir. 2017) (quoting *Richter*, 562 U.S. at 112).

Petitioner fails to show the state court's rejection of his ineffective assistance claim was unreasonable. Reviewing courts must "indulge a strong presumption that counsel's conduct falls within the wide range of professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689 (citation omitted). Here, as the state court noted, the record shows that Petitioner chose to address the court during sentencing and in doing so rather than ask the Court to consider the fact that he had witnessed violence as a child in a request for mitigation of his sentence, chose to continue to deny the charges and to maintain his innocence throughout sentencing and to attack the trial proceedings and his attorney's trial strategies. Petitioner argues it was defense counsel's obligation, not Petitioner's, to put forth the mitigation evidence that

Petitioner witnessed violence as a child. But defense counsel could have reasonably concluded it might appear inconsistent or disingenuous to argue that Petitioner should be considered less culpable, or to warrant less punishment, for crimes he continued to vehemently deny committing, because he had witnessed violence as a child. Furthermore, Petitioner's own declaration submitted in support of his PRP, while describing the violence he witnessed as a child, does not identify or explain how this experience has affected him or impacted his life as an adult or why it should be considered as mitigation for the crimes he was convicted of committing. Based on the record, defense counsel could reasonably have concluded that emphasizing Petitioner's lack of criminal history, love for his son, and his positive actions in his community was a better tactic to pursue under the circumstances. Petitioner fails to demonstrate that the state court's conclusion that Petitioner failed to show defense counsel's actions fell below objective standards of effective representation was unreasonable.

Furthermore, reweighing the evidence, Petitioner has not shown a reasonable probability that but for defense counsel's failure to submit evidence regarding Petitioner's having witnessed violence as a child during the civil war in Somalia, the result of the proceeding would have been different. The record shows the prosecution argued at sentencing that:

> The reason I thought it was appropriate to recommend above the middle of the range has to do with a lot of what the Court heard in trial; [S.K.'s] vulnerability, the length for which the defendant abused her, the manner in which he abused her, isolating her, removing her from her family, putting her in a position where she was so vulnerable and so isolated that I don't even think she would use the word rape to describe what happened to her. It was only when I asked, tell me about your sexual encounters, that she described them in a way that was clear it was a crime.
>
> The defendant stole [S.K.'s] childhood from her. He forced her to come here under false pretenses. And it would be impossible to estimate how much is actions have impacted her life.

Dkt. 10, Ex. 26 at 1879. Furthermore, as noted above, Petitioner's own declaration submitted in support of his PRP, while describing the violence he witnessed as a child, does not identify or

1   explain how this experience has affected him or impacted his life as an adult or why it should be

2   considered as mitigation for the crimes he was convicted of committing. In light of the serious

3   nature of Petitioner's crimes and the attendant circumstances described by the prosecutor,

4   Petitioner's decision to continue to deny the charges and attack the proceedings, and the lack of

5   evidence in the record connecting Petitioner's asserted childhood experience of violence to his

6   life and actions as an adult, the Court finds the state court reasonably concluded that Petitioner

7   failed to show prejudice under *Strickland*. In other words, the state court reasonably concluded

8   Petitioner failed to demonstrate that had defense counsel introduced the evidence that Petitioner

9   witnessed violence as a child in the civil war in Somalia, the likelihood of a different result was

10  substantial, not just conceivable.

11          In sum, Petitioner fails to show the state courts' rejection of his ineffective assistance of

12  counsel claim was contrary to or an unreasonable application of clearly established law, an

13  unreasonable determination of the facts, or that he is otherwise entitled to habeas relief.

14                  c.      *Failure to Explain Plea Options*

15          Petitioner argues trial counsel provided ineffective assistance because, "although trial

16  counsel may have explained [to Petitioner] the sentence structure of an indeterminate sentence if

17  [Petitioner] turned down a plea offer and lost at trial," Petitioner "did not understand the

18  explanation." Dkt. 5 at 33.

19          The United States Supreme Court has "long recognized that the negotiation of

20  a plea bargain is a critical phase of litigation for purposes of the Sixth Amendment right to

21  effective assistance of counsel" and "[b]efore deciding whether to plead guilty, a defendant is

22  entitled to 'the effective assistance of competent counsel.'" *Padilla v. Kentucky*, 559 U.S. 356,

23  364 (2010) (quoting *McMann v. Richardson*, 297 US. 759, 771 (1970).

REPORT AND RECOMMENDATION - 61

1

2      "Because 'an intelligent assessment of the relative advantages of pleading guilty is

3   frequently impossible without the assistance of an attorney,' [ ] counsel have a duty to supply

4   criminal defendants with necessary and accurate information." *Ian v. Sunn*, 800 F.2d 861, 865

5   (9th Cir. 1986) (quoting *Brady*, 297 U.S. at 748). "To show prejudice from ineffective assistance

6   of counsel where a plea offer has lapsed or been rejected because of counsel's deficient

7   performance, defendants must demonstrate a reasonable probability they would have accepted

8   the earlier plea offer had they been afforded effective assistance of counsel." *Missouri v. Frye*,

9   566 U.S. 134, 147 (2012).

10      As outlined above, the state court rejected Petitioner's ineffective assistance claim,

11   stating that:

12         before trial Noor rejected the State's plea offers, indicating that he "wasn't willing to
           consider several years in prison." He went to trial, where the jury convicted him of
13         multiple charges including a second degree rape charge that carries an indeterminate life
           sentence. Now, Noor claims that he "did not understand the plea bargaining process
14         fully" and "did not knowingly and intelligently give up the opportunity to plead guilty to
           a lesser charge, that would have meant him serving just a few years in prison." Noor
15         admits that his defense counsel communicated the State's offers and "attempted to
           explain to [him] what the sentencing consequences were." Noor does not claim that his
16         counsel failed to advise about the sentencing consequences if convicted on the second
           degree rape charge. Because he fails to present evidence indicating that his counsel's
           performance was deficient, Noor's claim fails.

17   Dkt. 10, Ex. 3 at 47-52.

18      The record supports the trial court's findings and conclusions. In his habeas petition,

19   Petitioner acknowledges that defense counsel "may have explained the nature of the sentence

20   structure of an indeterminate sentence if he turned down the plea offer and lost at trial" but

21   argues that he "a Somali refugee with limited experience in American courts – did not

22   understand the explanation." Dkt. 5 at 33. The record also contains communications between

23   defense counsel and the prosecutor indicating that Petitioner had rejected plea offers prior to trial

on that grounds that he "wasn't willing to consider several years in prison." Dkt. 10, Ex. 14 at

527. In his declaration submitted in support of his PRP, Petitioner states that:

> When I discussed with Mr. Leary [his second defense counsel] the plea offers that were
> being made before the trial, I did not understand the indeterminate nature of the sentence
> for rape in the second degree if I went to trial and lost. I did not understand that I would
> be given a life sentence and that it would be up to a board to let me out of prison and that
> I would still be on supervision for life. Had I known the seriousness of the penalties
> attached to the rape charge, I would have pled guilty to a non-sex felony to avoid being
> under the control of the Indeterminate Sentence Review Board for life.

Dkt. 10, Ex. 14 at 534-35.

But, as the state court found, Petitioner does not claim that his counsel failed to advise

him about the sentencing consequences if convicted on the second-degree rape charge. Petitioner

also does not explain, or present any evidence, as to how counsel's explanation or advice

regarding the plea deal was deficient. For instance, Petitioner does not argue and presents no

evidence that defense counsel gave him incorrect information or that he informed counsel that he

did not understand the nature of the plea deal or the potential consequences of turning down the

plea deal and that counsel refused to offer further explanation or guidance. Petitioner's bare,

generalized assertion after his conviction that he did not fully understand the sentencing

consequences, is insufficient to meet his burden of demonstrating ineffective assistance of

counsel.

In sum, Petitioner fails to show the state courts' rejection of this claim on the grounds

that he failed to demonstrate defense counsel's performance was deficient, was contrary to or an

unreasonable application of clearly established law, an unreasonable determination of the facts,

or that he is otherwise entitled to habeas relief on this claim.

        d.    *Ineffective Assistance of Appellate Counsel*

Petitioner argues that, "[o]n appeal, counsel did not raise challenges to the use of the

pseudonym "S.K." and 1998 birth date in the oral and written instructions to the jury, nor did

REPORT AND RECOMMENDATION - 63

1  counsel raise the same criminal conduct or double jeopardy claims regarding Counts 2, 3 and 8,

2  nor did counsel raise issues involving the trial court's coercive statements to the jurors." Dkts. 1,

3  5 at 30. Petitioner contends "[i]f there is merit to [his underlying legal] issues, then it also was

4  ineffective not to raise these issues either at trial or on direct appeal." Dkt. 5 at 31.

5      Claims of ineffective assistance of counsel on appeal are reviewed under a deferential

6  standard similar to that established for trial counsel ineffectiveness in *Strickland v. Washington*,

7  466 U.S. 668 (1984). *See Smith v. Robbins*, 528 U.S. 259, 285 (2000). Under this standard, a

8  petitioner challenging his appellate counsel's performance must demonstrate (1) counsel's

9  performance was objectively unreasonable, which in the appellate context requires a showing

10  counsel acted unreasonably in failing to discover and brief a meritorious issue, and (2) there is a

11  reasonable probability, but for counsel's failure to raise the issue, the petitioner would have

12  prevailed on his appeal. *Id.* at 285–86; *see also Wildman v. Johnson*, 261 F.3d 832, 841–42 (9th

13  Cir. 2001).

14      "The presumption of reasonableness is even stronger for appellate counsel because he has

15  wider discretion than trial counsel in weeding out weaker issues; doing so is widely recognized

16  as one of the hallmarks of effective appellate assistance." *Norris v. Dexter*, 2009 WL 2973036, at

17  *11 (S.D. Cal. Sept. 11, 2009) (citing *Miller v. Keeney,* 882 F.2d 1428, 1434 (9th Cir. 1989)).

18  The exercise of professional judgment in framing appellate issues makes it difficult to

19  demonstrate counsel's omission of a particular argument was deficient performance. *See*

20  *Robbins*, 528 U.S. at 288. Appellate counsel is not ineffective in refraining from appealing a

21  correct ruling. *People of the Territory of Guam v. Santos*, 741 F.2d 1167, 1169 (9th Cir. 1984).

22  Failure to raise meritless issues on appeal does *not* establish ineffective assistance of counsel.

23  *Martinez v. Ryan*, 926 F.3d 1215, 1226 (9th Cir. 2019). And if there is no prejudice from a trial

1    error, there can be no prejudice from an appellate error based on the same issue. *Garcia v.*

2    *Quaterman*, 454 F.3d 441, 450 (5th Cir. 2006). Habeas relief is unavailable on a claim of

3    appellate-counsel ineffectiveness unless the state court's denial of the claim "was so lacking in

4    justification that there was an error well understood and comprehended in existing law beyond

5    any possibility for fair[-]minded disagreement." *Harrington*, 562 U.S. at 103.

6    　　　　Here, Petitioner fails to show any of his underlying claims were meritorious and, as such,

7    he fails to show appellate counsel acted unreasonably in failing to raise those issues on appeal, or

8    that there is a reasonable probability that but for counsel's failure to raise the issues Petitioner

9    would have prevailed on appeal.[23] Petitioner fails to show that the state courts' rejection of this

10    claim was contrary to or an unreasonable application of clearly established federal law, an

11    unreasonable determination of the facts, or that he is otherwise entitled to habeas relief on this

12    claim.

13    　　　　Accordingly, Ground Seven should be denied.

14    　　　　8.    *Ground Eight*

15    　　　　In Ground Eight, Petitioner argues he is entitled to habeas relief based on "cumulative

16    error." Dkts. 1, 5 at 28-30.

17    　　　　"The Supreme Court has clearly established that the combined effect of multiple trial court

18    errors violates due process where it renders the resulting criminal trial fundamentally unfair." *Parle*

19    *v. Runnels*, 505 F.3d 922, 927 (9th Cir. 2007) (*citing Chambers v. Mississippi*, 410 U.S. 284, 298,

20    302-03 (1973). However, cumulative error only warrants habeas relief when the errors have "so

21

22    _____

[23] Petitioner makes no other arguments that the Court can glean as the basis for an ineffective assistance
of appellate counsel claim. To the extent he intends to raise additional challenges they are not clear from
the record and "conclusory allegations that appellate counsel was ineffective fall far short of establishing

23    a constitutional violation." *Russell v. Borders*, 2021 WL 616933 (C.D. Cal., Feb. 17, 2021) (citing *Bush v.*
*Muniz*, 2020 WL 6588393, at *22 (C.D. Cal. July 31, 2020) and *Jones v. Gomez*, 66 F.3d 199, 205 (9th
Cir. 1995)).

1   infected the trial with unfairness as to make the resulting conviction a denial of due process."

2   *Parle*, 505 F.3d at 927 (*quoting Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). Thus, the

3   essential questions a habeas court must consider when evaluating a claim of cumulative error are:

4   1) whether the combined effect of trial errors rendered a criminal defense "far less persuasive;" and

5   2) whether the combined errors therefore had a "substantial and injurious effect or influence" on

6   the jury verdict. *Parle*, 505 F.3d at 928.

7           Moreover, "[t]here can be no cumulative error when a defendant fails to identify more

8   than one error." *United States v. Solorio*, 669 F.3d 943, 956 (9th Cir.), *cert. denied*, 568 U.S. 829

9   (2012); *see also United States v. Laurienti*, 611 F.3d 530, 551 (9th Cir. 2010) (rejecting

10  cumulative error claim where defendants identified only one error, which was found to be

11  harmless), *cert. denied*, 562 U.S. 1161 (2011); *United States v. Sager*, 227 F.3d 1138, 1149 (9th

12  Cir. 2000) ("One error is not cumulative error."), *cert. denied*, 531 U.S. 1095 (2001). Where

13  Petitioner fails to demonstrate any prejudicial error, there is no basis to conclude the cumulative

14  impact of these alleged errors caused prejudice. *See Thompson v. Calderon*, 109 F.3d 1358, 1369

15  (9th Cir. 1997, *as amended* Mar. 6, 1997), *rev'd on other grounds*, 523 U.S. 538, 566 (1998)

16  ("Finding no prejudice from the errors taken separately, we also find no cumulative prejudice.").

17  Relief is warranted on a cumulative error claim only when there is a "unique symmetry" of

18  otherwise harmless errors such that they amplify each other in relation to a key contested issue in

19  the case. *Ybarra v. McDaniel*, 656 F.3d 984, 1001 (9th Cir. 2011).

20          In resolving Petitioner's claim of cumulative error on direct appeal, the Court of Appeals

21  stated:

22          Noor argues cumulative error denied him his right to a fair trial. The cumulative error
            doctrine applies if there are "several trial errors that standing alone may not be sufficient

23          to justify reversal but when combined may deny a defendant a fair trial." *State v. Greiff*,
            141 Wn.2d 910, 929, 10 P.3d 390 (2000); *In re Pers. Restraint of Cross*, 180 Wn.2d 664,
            690, 327 P.3d 660 (2014). Where, as here, any error had little or no effect on the outcome

1

2    of the trial, reversal is not required. *Cross*, 180 Wn.2d at 691; *State v. Weber*, 159 Wn.2d
     252, 279, 149 P,3d 646 (2006).

3    Dkt. 10, Ex. 2 at 32.  The Court notes that in addressing the other errors alleged by Petitioner on

4    direct appeal earlier in the opinion, the Court of Appeals found no error with the possible

5    exception of Petitioner's challenge to the trial court's ruling on a hearsay objection related to the

6    intimidation of a witness charge which the Court concluded was harmless as overwhelming

7    untainted evidence supported the jury finding Petitioner guilty of intimidating a witness. *Id.*

8         The Court of Appeals also rejected Petitioner's claim of cumulative error in denying

9    Petitioner's PRP. Having determined in the opinion that Petitioner did not prove any error, the

10   court rejected the cumulative error claim, stating:

11        Noor raises cumulative error as another ground for relief. Cumulative error is a doctrine
          "limited to instances when there have been several trial errors that standing alone may not
          be sufficient to justify reversal but when combined may deny a defendant a fair trial."
12        *State v, Greiff*, 141 Wn,2d 910, 929, 10 P.3d 390 (2000). Given our disposition of his
          other claims, there is no need to address cumulative error.

13   Dkt. 10, Ex. 3 at 52, n.7.

14        In his petition, Petitioner argues that the state courts did not address his cumulative error

15   claim and therefore the Court should conduct a *de novo* review of "all of the errors in this case

16   cumulatively" and grant relief. Dkt. 5 at 34. In his response to the respondent's answer,

17   Petitioner further argues that the state courts "never analyzed the cumulative effect of all issues,

18   separating out its treatment of each potential error, one-by-one." Dkt. 13 at 30. Petitioner argues

19   that this constituted "either an unreasonable application of Supreme Court precedent or the

20   application of the wrong standard" and he is entitled to habeas relief on *de novo* review.

21   Petitioner's arguments fail.

22        With respect to the Court of Appeals decision on direct appeal, in addressing the other

23   errors alleged by Petitioner on direct appeal earlier in the opinion, the Court found no error with

REPORT AND RECOMMENDATION - 67

the possible exception of Petitioner's challenge to the trial court's ruling on a hearsay objection

related to the intimidation of a witness charge, which the Court concluded was harmless as

overwhelming untainted evidence supported the jury finding Petitioner guilty of intimidating a

witness. Dkt. 10, Ex. 2. The Court then concluded that reversal was not required based on

cumulative error, noting that any error had had little or no effect on the outcome of the trial.

Furthermore, with respect to the state court's decision rejecting Petitioner's cumulative error

claim in the context of his PRP, the state court was not avoiding the claim as Petitioner alleges.

Rather, it appears the state court rejected the claim because, as it discussed in analyzing

Petitioner's other claims earlier in its opinion, Petitioner did not prove the existence of any

errors, let alone the existence of multiple errors, that might support a claim of cumulative error.

Dkt. 10, Ex. 3.

Petitioner fails to show that the state courts' decisions rejecting his cumulative error

claims were contrary to or an unreasonable application of clearly established law or an

unreasonable determination of the facts. Petitioner cites to no United States Supreme Court

precedent, nor is the Court aware of any, supporting his claim that a one-by-one "potential error"

analysis must be performed in order to assess the cumulative effect of all rulings. Furthermore,

as noted above, it appears the state courts did not find more than one error in analyzing

Petitioner's substantive claims and, accordingly, reasonably rejected Petitioner's cumulative

error claims. *See Solorio*, 669 F.3d at 956 ("[t]here can be no cumulative error when a defendant

fails to identify more than one error.") Furthermore, the Court here has rejected all of Petitioner's

claims raised in his habeas petition alleging the state courts erred and, as such, he fails to

demonstrate cumulative error. *See id.* Finally, the Court notes that the conclusory arguments

Petitioner raises in his brief on this issue fail to identify and demonstrate that any "unique

REPORT AND RECOMMENDATION - 68

1    symmetry" of error exists in this case such that he would be entitled to habeas relief based upon a

2    claim of cumulative error.

3        In sum, Petitioner fails to show that the state court's decision was contrary to or an

4    unreasonable application of clearly established law or an unreasonable determination of the facts,

5    or that he is otherwise entitled to habeas relief on this claim. Accordingly, Ground Eight should

6    be denied.

7                                    **EVIDENTIARY HEARING**

8        To the extent Petitioner seeks an evidentiary hearing, such a hearing is precluded here by

9    *Cullen v. Pinholster*, 563 U.S. 170 (2011). As discussed above, Petitioner's claims were

10   adjudicated on the merits by the state courts, and the state courts' rejection of the claims are

11   neither contrary to or an unreasonable application of clearly established Supreme Court law or

12   based upon an unreasonable determination of the facts given the record. Under these

13   circumstances, this court is barred from conducting an evidentiary hearing to further develop the

14   facts on Petitioner's claims. *Pinholster*, 563 U.S. at 185 ("If a claim has been adjudicated on the

15   merits by a state court, a federal habeas petitioner must overcome the limitations of § 2254(d)(1)

16   on the record that was before the state court.")[24]; s*ee also Sully v. Ayers*, 725 F.3d 1057, 1075

17   (9th Cir. 2013) ("Although the Supreme Court has declined to decide whether a district court

18   may ever choose to hold an evidentiary hearing before it determines that § 2254(d) has been

19

20

_____

21   [24] The *Pinholster* limitation also applies to claims brought under § 2254(d)(2). *See Gulbrandson v. Ryan*,
     738 F.3d 976, 993, n. 6 (9th Cir. 2013) ("*Pinholster* and the statutory text make clear that this evidentiary
22   limitation is applicable to § 2254(d)(2) claims as well. *See* § 2254(d)(2) (allowing for habeas relief if the
     state court decision 'was based on an unreasonable determination of the facts in light of the evidence
23   presented in the State court proceeding.') (emphasis added); *Pinholster*, 131 S.Ct. at 1400 n. 7 (comparing
     (d)(1) to (d)(2) and stating that (d)(1) 'also is plainly limited to the state-court record.') (emphasis
     added)").

1  satisfied . . . an evidentiary hearing is pointless once the district court has determined that §

2  2254(d) precludes habeas relief.") (internal quotation marks and citation omitted).

3      In sum, in determining whether relief is available under 28 U.S.C. § 2254(d)(1) or (2), the

4  Court's review is limited to the record before the state court. *Pinholster*, 563 U.S. 170. A hearing

5  is not required if the allegations would not entitle Petitioner to relief under 28 U.S.C. § 2254(d).

6  *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007). "It follows that if the record refutes the

7  applicant's factual allegations or otherwise precludes habeas relief, a district court is not required

8  to hold an evidentiary hearing." *Id.* Here, the Court concludes Petitioner is not entitled to relief

9  and that the habeas claims may be resolved by review of the existing record; accordingly no

10  evidentiary hearing is required because Petitioner's allegations do not entitle him to habeas

11  relief. The Court concludes Petitioner's request for an evidentiary hearing should be denied.

12  **CERTIFICATE OF APPEALABILITY**

13      A prisoner seeking post-conviction relief under § 2254 may appeal a district court's

14  dismissal of the petition only after obtaining a certificate of appealability ("COA") from a district

15  or circuit judge. A COA may be issued only where a petitioner has made "a substantial showing

16  of the denial of a constitutional right." *See* 28 U.S.C. § 2253(c)(3). A petitioner satisfies this

17  standard "by demonstrating that jurists of reason could disagree with the district court's

18  resolution of his constitutional claims or that jurists could conclude the issues presented are

19  adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327

20  (2003). Under this standard, this Court concludes that Petitioner is not entitled to a COA with

21  respect to any of the claims asserted in his petition. Petitioner should address whether a COA

22  should issue in his written objections, if any, to this Report and Recommendation.

23  //

1

**CONCLUSION**

2       Based upon the foregoing, the undersigned recommends that the federal habeas petition

3   (Dkt. 1) be DENIED and the case be DISMISSED with prejudice. The Court also recommends

4   that a COA be DENIED. A proposed order accompanies this Report and Recommendation.

5                              **OBJECTIONS AND APPEAL**

6       This Report and Recommendation is not an appealable order. Therefore, a notice of

7   appeal seeking review in the Court of Appeals for the Ninth Circuit should not be filed until the

8   assigned District Judge enters a judgment in the case.

9       Objections, however, may be filed and served upon all parties no later than **December 6,**

10  **2022**. The Clerk should note the matter for **December 9, 2022**, as ready for the District Judge's

11  consideration if no objection is filed. If objections are filed, any response is due within 14 days

12  after being served with the objections. A party filing an objection must note the matter for the

13  Court's consideration 14 days from the date the objection is filed and served. The matter will

14  then be ready for the Court's consideration on the date the response is due. The failure to timely

15  object may affect the right to appeal.

16      DATED this 15th day of November, 2022.

17

18      _____
        BRIAN A. TSUCHIDA

19      United States Magistrate Judge

20

21

22

23

REPORT AND RECOMMENDATION - 71